## ROBINSON et al. v. BENBOW.

(Circuit Court of Appeals, Fourth Circuit.  May 6, 1924.)

No. 2191.

1. **Corporations ☞187—Stockholders may purchase sufficient other stock to obtain controlling interest.**

Stockholders may legally go into the market and purchase sufficient other stock to gain control of the corporation.

2. **Insurance ☞35—Fire insurance corporation's executive committee may not enter into reinsurance contract with other insurance company.**

By-laws of fire insurance corporation giving executive committee general supervision over corporation's affairs *held* not to empower the committee, without authority from stockholders, to enter into reinsurance contract with other insurance company transferring, for five-year term, the entire management of the corporation's underwriting and full control of its officers and agents.

3. **Insurance ☞35—Executive committee of fire insurance company held not authorized to enter into reinsurance contract by reason of other reinsurance contracts previously entered into.**

Fire insurance corporation's executive committee *held* not authorized to enter into reinsurance contract giving insurance companies for five-year term, the entire management of the corporation's underwriting, and full control of its officers and agents, though the committee had from time to time reinsured part of its business in one or in several states without giving such other insurance companies the full control of its officers and agents.

4. **Corporations ☞393—Wisdom of contract question for majority of stockholders and not courts.**

A court will not concern itself with the wisdom of a corporation's contract on failure of stockholders to agree, the question being one for the majority of the stockholders.

5. **Injunction ☞148(1)—Issuance of restraining order and temporary injunction without bond prohibiting majority stockholders from voting stock held erroneous.**

Issuance of restraining order and preliminary injunction restraining the majority of stockholders from voting at stockholders' meeting or from interfering with performance of contract entered into by executive committee of the directors, without requiring a bond from minority stockholders seeking injunction, under the Clayton Act, *held* erroneous.

6. **Insurance ☞682—Fire insurance company held required to stand expense of disentangling affairs of other company with which it had entered into unauthorized reinsurance contract.**

Fire insurance company, which entered into reinsurance contract with other company by which other company transferred to it the full control of underwriting for five-year term executed by other company's executive committee with notice of facts which should have put it on inquiry which would have disclosed opposition thereto by majority stockholders, was required to stand the loss incident to disentangling the affairs of the companies on adjudication of invalidity of contract because made without stockholders' consent.

Appeal from the District Court of the United States for the Western District of North Carolina, at Greensboro; James E. Boyd, Judge.

Suit by Charles D. Benbow against C. O. Robinson and others. Decree for plaintiff, and defendants appeal.  Reversed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

298 F.—36

Louis M. Swink, of Winston-Salem, N. C., and Hartwell Cabell, of New York City (Isaac M. Meekins, of Elizabeth City, N. C., on the brief), for appellants.

Sidney S. Alderman and William P. Bynum, both of Greensboro, N. C. (Frank P. Hobgood, Jr., of Greensboro, N. C., on the brief), for appellee.

Aubrey L. Brooks, of Greensboro, N. C. (Brooks, Parker & Smith, of Greensboro, N. C., on the brief), for Hartford Fire Ins. Co.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. The Dixie Fire Insurance Company, hereinafter called the Dixie, is a North Carolina corporation with its principal offices at Greensboro, in the Western district of that state. It has outstanding 10,000 shares of capital stock each of the par value of $50. The appellants are all citizens of North Carolina and were defendants below together with the Dixie and the Hartford Fire Insurance Company, a Connecticut corporation which for brevity will be styled the Hartford. The appellants by blood or by marriage are all connected with the Blades family, well known in the Eastern section of North Carolina. The six of them, nine of their relatives, and two corporations controlled by them, together own 5,177 shares of the Dixie stock. At the time this litigation began they were authorized to vote for twenty-two other stockholders, holding an aggregate of 418 shares, so that they represented 39 separate stockholders holding in all 5,595 shares or but a shade under 56 per cent. of the entire capital of the Dixie.

The appellee, Charles D. Benbow, was plaintiff below. He is a citizen of Florida and holds 225 shares of the Dixie stock. He is one of its directors and is a member of its executive committee. At least six other stockholders, all of whom are directors and three of whom are members of its executive committee, are shown by the record to be in sympathy with him. There are doubtless other shareholders who are of like mind, but who they are, what is their number, and the extent of their holdings, is not disclosed.

The controversy here to be passed upon arose out of a contract which the plaintiff and the majority both of the executive committee of the Dixie and of its directors claim was made between it and the Hartford. The Blades group, on the other hand, assert that those who in the name of the Dixie assumed to enter into that contract had no legal authority to do so and that the Dixie is not bound by it.

The Benbow party say that the Dixie is legally obligated by the contract, and that the arrangement made thereby is highly advantageous to the corporation, and they contend that if the Blades group are permitted to elect officers and directors who will seek to ignore it or to set it aside, great and irreparable damage will be done to the Dixie and to all those who hold its stock.

The learned court below held that Benbow had established the truth of these allegations, and in order to prevent the holders of the majority of the stock from doing what they wished to do, enjoined them, among other things, from doing anything to question the binding force

of the contract at any time in the entire five years during which it was by its terms to run.

Before discussing the legal questions to be passed upon, it will be worth while briefly to summarize the events which led to the present controversy. Eighteen years ago, the Blades group or the members of their connection from whom their Dixie stock came had much to do with the organization of that corporation and of another fire insurance company which afterwards merged with it. It does not appear that at any time before early March, 1923, this group ever actually held as much as 50 per cent. of the Dixie stock, but their holdings of upwards of 40 per cent. were very much greater than those of any other group accustomed to act together, so that they were at all times so influential in its affairs that it would never have been easy to commit it to any course of action to which they were opposed. It so happens, however, that prior to the 11th of February, 1923, there never had been occasion to muster votes on any question. Everything seems always to have been done by unanimous consent or, at all events, without the registration of any objection. In their earlier years, neither the Dixie nor the other company with which it was consolidated prospered. Indeed, a substantial part of the money originally invested in them was lost. They were united in an attempt to give them a better chance. Shortly after they were brought together, the Blades group induced a Mr. Bush, who then lived in Newark, N. J., and who was an experienced fire underwriter, to come to Greensboro and to take charge of the Dixie's insurance line. A few years later, he was made president of the company and has ever since held that position. Before February 12, 1923, the relations between him and the Blades group appear to have been cordial. They, or some of them, had recently lent him money to buy additional stock in the company. Under his management it had done well. It had accumulated a substantial surplus and had paid dividends at the rate of 6 per cent. on the capital remaining at the time of the consolidation, but which rate was the equivalent of but 3 per cent. on the money once invested in the two companies.

At least one of the original Blades group had died. The survivors resided for the most part in a relatively distant part of the state. They were content with two of the six members of the executive committee and with three out of the ten directors. Of the other four members of the committee, one was the plaintiff, of late years a resident of Florida, and the other three were salaried officers or employees of the company. They were Bush, its president, Brooks, its general counsel, and one Latham. Of these only the president, whose salary was $17,-500, was in receipt of any large compensation. As none of the members of the Blades group took much if any part in the day by day management of the Dixie, they had come to look upon it merely as a place in which they had a large investment which was yielding a rather small return. They had begun to feel and to say that they would like to get their money out and to put it in some of the enterprises in Eastern North Carolina with which they were in intimate touch and from which they thought they were in a better position to profit. They

do not appear to have been altogether alone in their feeling that the stock was not a specially attractive investment. A Mr. Hopkins, who was one of the directors who took the side of Benbow and Bush, when the division came, seemed to have been pretty much of the same mind. He, too, was talking about selling out unless something was done to improve the prospects of the company. He apparently had come to think it might be a good idea to work out some arrangement by which the Dixie would become an ally of some larger insurance company or a feeder for it. He appears to have brought up the subject in several conversations he had with a Mr. Prescott who resided at Atlanta and who was the Southern representative of the Hartford. As a result of these interviews, he concluded that the Hartford might make a deal with the Dixie of advantage to the latter. He told Bush so and urged him to see Prescott. On the next day, which was January 23, 1923, Bush was in Atlanta and talked with Prescott on the subject. Both of them obviously felt it worth while to go further, and Prescott arranged for an interview between Bush and Bissell, president of the Hartford. This was held on Friday, February 9th, and they went over the whole matter and reached a mutually satisfactory understanding, the essence of which was that the Hartford would reinsure 90 per cent. of substantially all the Dixie's outstanding risks and of all the latter should write in the next five years, and that in order that the Hartford should itself determine what risks should be assumed during that period by the Dixie the latter would delegate to the former during the continuance of the contract the right to select, control, and fix the compensation of all ·its underwriting officers and agents. There were many other things agreed upon, as, for example, as to what return, fixed and contingent, should be made by the Hartford to the Dixie, as to the renewal of the contract if it was renewed, and if the Dixie at the end of the five years wanted to put an end to it, what it would have to pay the Hartford for the privilege of so doing, and as to many other details perhaps of lesser but still of real importance. Some of the matters to be dealt with were highly technical, and some of the provisions to be made for them would necessarily be both lengthy and not easily comprehensible by anyone not an experienced underwriter. To reduce to writing the understanding reached some time in the afternoon of Friday, the 9th of February, would necessarily take some hours, and so far as Bush was concerned, time was of the shortest.

The annual meeting of the stockholders of the Dixie was scheduled for the succeeding Wednesday, the 14th. Bissell's testimony makes it clear that when they parted on that Friday afternoon, both he and Bush intended to lay the proposed contract before this meeting for its approval. Less than five days remained before it was to be held, one of them a Sunday and another Saturday, a half holiday. Up to this time Bush had not told any of the Blades group that he was thinking of making a deal with the Hartford of any kind, and indeed until after his talk with Bissell, there was little or nothing he could have told them or any one.

It was practically certain that the Blades group would vote the ma-jority of stock which would be actually represented at the coming meeting, and it was necessary for Bush to secure their approval in advance. They, or most of them, were at Elizabeth City, and he would have to go there. There were things to be done at Greensboro in preparation for the meeting and the approval by it of the contract. Accordingly, he decided not to wait either in New York or in Hartford until the contract had been reduced to writing. He left that to Bissell. He telegraphed the Blades group that he would be in Elizabeth City the next day, Saturday, and wanted to talk with them. On Friday night, he took the train from New York for that point, and on Saturday talked over the proposed contract with their representatives. He himself as yet had nothing in writing, and it was not possible for him to go into every detail; but his story of what was proposed seemed, as they listened to him, good, and they told him so. When he took the night train to Greensboro, it was with the conviction that everything was running smoothly.

After he had left and they talked it over more deliberately and coolly among themselves and with some of their business advisers, doubts arose. They began to feel that the matter was too important to be rushed hurriedly through. On Monday morning, they called Bush up by telephone and asked him to postpone the stockholders' meeting for 30 days. He was reluctant to do so, and on that day and on Tuesday, the 13th, several other telephonic conversations were had between him and them, some at their instance and at least one at his. They could not be persuaded to attend the meeting on the 14th and, if none of their stock should be then represented, there was no hope for a quorum. Bush was unwillingly compelled to assent to the postponement. There is some difference of recollection as to what reasons they then gave for insisting on the delay, but there can be no question that Bush gathered from them that it was probable that the group would not favor the plan which by that time he had come to have very much at heart.

In the meanwhile at the other end, Bissell had been busying himself in reducing the contract to written form. He had apparently hoped to mail the completed document to Bush on Saturday but that was a short day, and he did not get it finished until Monday. Even then, according to his testimony, it was hastily prepared. He had taken a form of contract under which a smaller company had turned over to the Hartford all its business and had told his secretary to adapt that to the different agreement which he had reached with Bush. In the haste with which this was being rushed, care was not taken to strike out all phrases inconsistent with the purpose in hand. In their absorption in the development of the struggle which subsequently took place, neither the representatives of the Hartford nor Bush and his associates gave much thought to perfecting the phraseology of the original draft, and the inconsistencies which were in it when it left New York on the 12th still remained in the agreement which twelve days later was approved by the majority of the executive committee of the Dixie. As the draft was not mailed by Bissell until the 12th, it could

not have reached Greensboro before the 13th at the earliest. Bissell wrote Bush that he hoped it could be put through on Wednesday, but it was quite possible that Bush would want to adjourn the directors' and stockholders' meetings for a few days or a week, so that during the interval the contracts and everything else might be gotten into proper shape. He said he saw no objection to this course, although it was advisable to close the matter promptly to prevent injurious discussion. He also told Bush that he had wired Prescott to come to Greensboro immediately, had given him full authority, and had mailed to him at the hotel in Greensboro a copy of the contract.

The scheduled meeting of the executive committee was held on the 13th. The two members belonging to the Blades group did not attend. The other four, whose names have already been mentioned, constituted a quorum. They resolved that the president, Bush, and the general counsel, Brooks, should investigate the proposition of the Hartford to reinsure a certain portion of the underwriting business of the company, get it into proper shape, and cause it to be put in the form of a contract agreement so that it might be intelligently acted upon at a subsequent meeting of the committee. It is quite possible, at the time of the meeting of the committee, Bush had not as yet received the draft from Bissell. At all events, there is nothing in the record to show that it was then laid before the committee. It is more noteworthy that although on the 16th several members of the Blades group were in Greensboro and had a more or less prolonged conversation with Bush, he does not appear to have shown them the draft or even told them that he had it.

It is certain that at these interviews, if not before, the Blades group made their opposition to the contracts perfectly plain, not only to Bush, but to the plaintiff Benbow and to Latham. There is a great deal of testimony about what took place at these various conversations. The difference is not so much as to what was talked about or perhaps speaking generally as to what was said, but it is as to the connection in which the words were used and the emphasis which should be put upon particular statements. There is no dispute that the Blades group let it be understood that they did not care to hold stock in a company which for five years at least would be a mere subsidiary of the Hartford. Whether other people thought the arrangement was a good one or a bad one, it did not appeal to them. They would much rather get their money out of the company. It is equally clear that they stated their willingness to sell out their holdings, either to such of the minority stockholders as wished to buy or to the Hartford. It is also certain that the price they indicated they would ask for their stock was much higher than any which had for many years been paid by any one. It was perhaps twice as great as that which had usually been realized for the small blocks which had occasionally changed hands. Benbow, Bush, and their associates say that the Blades group were trying to hold up the minority and to obtain for their stock a nuisance value; that they were not willing to consider the proposed contract on its merits or to give weight to the possible advantage it might be to the Dixie and to such of its stockholders as wished to retain their

stock. From the standpoint of the plaintiff and those who are acting with him, the majority were trying to compel the purchase of their stock at a price much above either its market or its real value. On the other hand, the Blades group assert that all that they said in any of these conversations, all that they had in mind, and all they intended to convey, was what they are as ready now, as then, to affirm, namely, they want to get their investment out of the Dixie so soon as they can get for it what it is really worth; they do not like the proposed arrangement with the Hartford; they do not intend, if they can help it, to hold large blocks of stock in a company in the position in which that arrangement would put the Dixie; they do not wish unnecessarily to prevent Benbow, Bush, and those who think with them from entering into whatever bargain with the Hartford commends itself to their judgment; they are therefore willing to sell their stock to the Hartford or to anybody who wants to enter into a contract with that company, always provided they get for what they sell what the Dixie's books show it to be worth and that they figure out is at least $125 per share. In the plaintiff's bill, in the testimony, and in the final decree of the learned court below, much is said of an alleged threat by the Blades group to liquidate the Dixie. How they were going to do it, nobody seems to have asked. Under the laws of North Carolina, a corporation cannot go into voluntary liquidation without the assent of the holders of at least two-thirds of its stock. The Blades group never had or pretended to have so much. If they thought that liquidation would be to the best interests of the stockholders, they had a right to tell their fellow shareholders so, and, if enough of them agreed, the Dixie could have been lawfully wound up. No wrong would have been done. We therefore shall not stop to analyze the contradictory evidence as to whether any such threat ever was made. It is not pretended that any steps were ever taken to put it into execution.

As a result of the various conversations between the representatives of the Blades group, on the one hand, and Benbow, Bush, and Latham, on the other, the latter understood that the former were opposed to the suggested contract with the Hartford and that they would submit a written offer to sell their stock. From a careful examination of all the testimony with reference to these interviews, that is all they amounted to. The representatives of the Blades group promised to consult its other members and to mail the offer to Bush in New York whither he, together with Brooks, was about to go to continue negotiations with the Hartford. The letter was duly written and reached Bush in New York about the 21st of February. It gave him an option until March 1st on the Blades' holdings of from 4,200 to 4,300 shares at $125 per share. Bissell told Bush that the Hartford would not consider buying at any price, and the option was allowed to lapse. It does not appear whether the conversations which Bush and Brooks had with Bissell somewhere around the 20th of February resulted in any changes in the draft of the proposed agreement, as that had been drawn up by Bissell 8 or 10 days earlier; but, as already stated, some of the ambiguities and infelicities of expression which resulted from

the haste with which Mr. Bissell was then working were not eliminated. Bush made up his mind, perhaps when he was in New York, to try to put through the deal without asking or obtaining the previous assent of the stockholders. He called a special meeting of the executive committee for February 24th, and he seems to have arranged with Bissell that on that day Prescott should be at Greensboro armed with authority to execute the contract on behalf of the Hartford and to receive the $300,000 worth of securities which the Dixie was simultaneously to turn over to his principal. The two representatives of the Blades group on the executive committee were notified that the meeting would be held, and, while this notice was of the shortest and was couched in somewhat obscure terms, it was sufficient to make them understand that some action with reference to the proposed contract was contemplated. It was precisely because they did so understand that they kept away from the meeting as they had done from that held eleven days earlier. Indeed, during all the period of contention, they followed more or less strictly the policy of absenting themselves from the meetings of the directors and executive committee; under the apparent belief that presence might bind when absence would not. That course not only smacks somewhat of discourtesy to their associates, but what is more important, it is not in keeping with the obligations which as directors they owed to all the stockholders. It was up to them to do all that in them lay to keep the company from doing an unwise thing. As a rule their duty would have been to have gone to all the meetings at which they had reason to fear such action might be proposed and there to use all their powers of persuasion to bring their fellow members to their own way of thinking. Their staying away might under some circumstances have defeated the very end they had at heart. In this case, it misled no one. On February 24th, the majority of the executive committee knew that the Blades group were opposed to the ratification of the proposed agreement, and they also knew that they were asked to authorize its execution and to put it into immediate effect for the very reason that it had become doubtful, to say the least, whether the holders of the majority of the Dixie stock could be induced to approve it.

They made up their minds to confront all objectors with an accomplished fact. At the meeting the contract was read over, and although the testimony of some of the committee shows that they had anything rather than a clear understanding of some of its provisions, they voted that it should be executed on behalf of the Dixie, should go into effect as of noon that very day, and that there should be at once turned over to Prescott, who was present as the representative of the Hartford and who on its behalf executed the contract, securities of the Dixie of the market value of $300,000. That gentleman on the 24th arranged with the American National Bank at Greensboro to forward these securities to the Hartford at its home office in Connecticut. For some reason or for lack of any, there was for a few days an attempt, or what naturally appeared to the Blades group to be an attempt, to keep them in ignorance of the details of what had been done. On the evening of the 24th, one of the Blades members of the

executive committee asked the secretary of the company to let him see the minutes of the meeting and to tell what had been done at it. The reply he received was that Bush had given instructions not to tell what the committee had done. On the next day, one of the Blades group went to Winston-Salem to confer with a member of his group living there. On the advice of this gentleman, he on that day, the 25th of February, retained as his counsel Mr. Swink, who went back with him to Greensboro, arriving late that evening. He, that is to say, the representative of the Blades group on the executive committee, called up the secretary and again asked him what had been done. The secretary said he preferred not to talk with him, but by persistence there was finally gotten out of him the statement that the reinsurance contract had been signed and $300,000 of the company's securities turned over to the Hartford. More, he said, he could not tell, as Bush had instructed him not to talk. The next day, the two Blades group members of the executive committee went with Mr. Swink to Raleigh to see whether the insurance commissioner had received a copy of the contract. He told them that if any such contract had been made, it should be filed in his office; but as yet, it had not been.

[1] In the course of conversation with this gentleman, it appears that he more or less casually suggested that the best way for the Blades group to protect their already large holding of the stock was to buy enough shares to give them an absolute majority of it. This suggestion appealed to them, and they immediately went over to the Wachovia Bank and instructed its officials to go into the market and buy the necessary number of shares. The bank had no difficulty in successfully executing this commission and in the next few days bought some 900 shares at various prices averaging something over $100 per share. This transaction has been much criticized by the plaintiff and those who are in sympathy with him. Its taste may be questionable, but we know of no legal objection that can be made to it. On March 1st one of the representatives of the Blades group, together with Swink, were again in Greensboro. This time they went to the Dixie's office and asked for a copy of the contract, only to be told that the only one the company had was in possession of Brooks, the general counsel, who had taken it to New York with him. Two days later, on March 3d, another visit by the representative of the Blades group to the Dixie's office resulted in his obtaining a copy of the contract precisely one week after it had gone into effect.

The idea that the ratification of it should be sought at the stockholders' meeting had not then been abandoned, for Bush, on the 6th of March, wrote Bissell that he hoped there would be no opposition at the annual meeting to confirming the arrangement. On the 8th, a representative of the Blades group asked Bush why the contract was executed without waiting for the approval of the stockholders, and he was told that Brooks, the general counsel, had said that it could be done that way.

The representative of the Blades group went to New York and employed Mr. Meekins, who had previously represented him in some matters and who had a great deal of insurance experience. Mr. Mee-

kins introduced the representative of the Blades group to a Mr. Schreiner, who for many years had been the American manager of the Munich Reinsurance Company, and who was internationally recognized as an expert in reinsurance matters. According to that gentleman's testimony given under commission in New York, a copy of the contract was shown him, and he was asked his opinion about it without being told whether his questioner was in favor of it or against it. He at once took the position that from the Dixie standpoint it was unwise. He testified that he was not then and never has been professionally employed in the matter. He suggested that the Blades group should further retain Mr. Hartwell Cabell a well-known specialist in insurance law. That gentleman immediately notified the Hartford that his clients took the position that without the ratification of the stockholders of the Dixie, the contract was not binding on it and that such ratification would not be given.

The annual stockholders' meeting of the Dixie, which had been postponed from February 14th, was scheduled for the 16th of March. Some days before that date, everybody concerned knew that the holders of the majority of the stock were opposed to the contract, claimed that the executive committee had no authority to ratify it and that the attempt to do so was null and void. Were they right in this conclusion?

[2] The by-laws provide that when the stockholders are not in session, the directors shall have power to do or cause to be done all things that are proper for the company, and that the executive committee shall have general supervision over all the affairs of the company when the board of directors is not in session. No authority has been cited for the proposition that under such a grant of power an executive committee can enter into a contract like that here in controversy, which among many other things provides that for five years the entire management of the Dixie's underwriting including employees and underwriting officers of the Dixie Company, and the management and decisions with reference to underwriting expenses, shall be under the sole direction of the Hartford and requires the Dixie to qualify during the five years of the contract as officers, agents, or special agents without compensation, such members of the official, managerial, or field staff of the Hartford, as may be necessary or convenient for the purposes of the contract, and prohibits the Dixie Company at any time during the life of the contract or of any extension thereof from engaging in or carrying on the business of insurance of any kind except to the exceedingly limited extent provided for in the contract.

We ourselves have found no decided case which holds that it or anything like it can be done, and we are frank to say that we would be very reluctant to follow one if we had. 20 Harvard Law Review, 225.

[3] There is nothing in the record to suggest any occasion whatever for haste, and no reason why the judgment of the stockholders of the corporation could not and should not have been taken upon the contract before any attempt was made to put it into execution. We are not impressed with the suggestion of the plaintiff that the executive

committee must be held to have been given the authority it assumed to exercise because it is shown that at various times that committee had reinsured a part or all of its business in one or in several states. We may put on one side the fact that the stockholders were always called on to ratify such acts and did, and it is unnecessary to decide whether in the absence of such ratification the company would have been bound by them. In point of fact, they were the sorts of engagements which insurance companies in the ordinary course of their business frequently find it convenient to make. Except in that they were called reinsurance contracts, none of them had any resemblance to the one in controversy. Each of them left the Dixie in actual conduct of an insurance business and in full control of its own officers and agents. For the Dixie to surrender for five years all right to select or control them was not a matter within the scope of its ordinary business. On this record it is unnecessary to inquire whether the stockholders themselves would have the power to abdicate for their corporation the duty of selecting its own officers.

[4] On the day before the stockholders' meeting, it appears that Mr. Swink, one of the counsel for the Blades group, gave an interview to a Greensboro paper in which it is testified he announced that the Blades group held the majority of the stock and proposed at the meeting not only to declare that the contract was not binding upon the company and would not be accepted by it, but that they would also retire many of the old directors and put in their places men who would elect a new president and perhaps other officers. This indiscretion naturally enough increased the tension between the two sides, and it confirmed Brooks, Bush, Latham, and Hopkins, and those in sympathy with them, in their determination to put their scheme through whatever the majority of the stockholders thought about it. By the afternoon of the 15th, they made up their minds to seek the aid of the courts in prolonging their control of the company. Benbow coming from Florida reached Greensboro something after 4 o'clock that day. It was determined that he should employ counsel to prepare and file a bill in the District Court of the United States to enjoin the holders of the majority of the stock of the company, not only from taking any action looking to the repudiation of the alleged contract, but also from exercising their ordinary right to elect officers of the corporation. Such a bill was prepared and filed at half past 10 on the forenoon of the 16th, an hour and a half before the stockholders' meeting was to come together. One allegation which bulks large in it was that the stock of the majority was held in a pool or voting trust contrary to what has been repeatedly held by the North Carolina courts to be the policy of that state. Bridgers v. First National Bank, 152 N. C. 293, 67 S. E. 770, 31 L. R. A. (N. S.) 1199. The evidence shows beyond any possibility of question that there never was any such pool or voting trust. The Blades group of stockholders, relatives by blood and marriage, had, or thought they had, a common interest and were in the habit of acting together, and every one of them wished to continue to do so, but they had entered into no agreement which impaired their independent right each to vote his or her stock as he or she

saw fit. It is also alleged that the majority of the stockholders had made up their minds to liquidate the company to the destruction of the interests of the minority. What we have already said is sufficient to show that this allegation cannot be sustained. It should be borne in mind in this case that there is no suggestion that in the event of liquidation the Blades group purposed to seek to buy in the assets of the corporation or any of them at less than their value, or indeed at any price, or that they desired liquidation to further the ends of any business competitor, of the Dixie. The worst that can be said of their position was that they wanted their money out of the Dixie so badly that in certain contingencies they were willing to stand their portion of the sacrifice which liquidation usually entails. With these allegations as to the voting trust and the intention to liquidate put aside, all that remains of the bill are its charges that the contract with the Hartford was from the Dixie standpoint good, that it had been legally ratified by the executive committee, and that any attempt, successful or unsuccessful, to upset it, would work irreparable injury to the company and to all its stockholders. This contract not only was unusual, but it was naturally extremely complicated. The experts differ as to the interpretation of many of its details, and even more radically as to whether it will or will not prove advantageous to the Dixie. It is one of the kind of things about which stockholders are likely to differ, and, when they do, the majority have the right to decide. It is not for the courts to say which of them is right, or to inquire into the motives which inspire them. Noyes on Intercorporate Relations, § 114.

[5] At the time the bill was presented to the learned judge below, he, of course, was bound to assume that its important allegations would be sustained by adequate testimony; but even upon the assumption that the plaintiff upon his showing might have been entitled to some form of restraining order, none should have been issued without demanding from him the bond required by the express terms of the Clayton Act (38 Stat. 730). Upon the face of the bill, it appeared that large interests were involved. The plaintiff was asking the court to prohibit some of the defendants from exercising a right ordinarily theirs. Under the circumstances and independent of the statutory provisions, a very substantial bond should have been required, but none was. The temporary restraining order was issued and was sweeping in its terms. Pending the hearing of the motion for a preliminary injunction, it restrained the majority of stockholders "from in any wise voting any share or shares of any stock in the defendant Dixie Fire Insurance Company, owned or controlled by them in a meeting to be held on this day or in any other meeting of the stockholders of the said corporation to be held during the continuance of this restraining order, from in any wise voting in such meeting or electing or declaring elected any directors, officers or agents of the said Dixie Fire Insurance Company; from in any way interfering with or causing the breach of or preventing the execution of the reinsurance contract which has been entered into between the Dixie Fire Insurance Company and the Hartford Fire Insurance Company, and from in any way

interfering with, obstructing or otherwise preventing the regular and legitimate prosecution by the present executive committee and officers of the defendant, Dixie Fire Insurance Company, of the business of that company as heretofore during the continuance of this restraining order." The Dixie and the Hartford, who were also made defendants, were restrained from "in any way breaching, canceling or refusing to carry out the reinsurance contract entered into by them." The plaintiff having sworn to this bill and intrusted it to his counsel for filing, at 10 o'clock betook himself to the meeting of the Dixie's directors. Nine members of the board were present; seven of them (six besides himself) were of his way of thinking, one was neutral, and one of the Blades group attended, as he explained, for the purpose of protesting that the board was not legally constituted. At the meeting, both sides agreed that the majority of the stockholders were opposed to the ratification of the contract, but in spite of this fact, or because of it, a resolution to ratify the contract was put and adopted by the unanimous vote of the seven directors who voted at all. The bill of complaint had been filed at half past 10. From the minutes it would appear that the resolution ratifying the contract must have been adopted an hour later. In 30 minutes the stockholders were to meet. It is needless to say that even assuming that the board of directors, when the stockholders were not in session, might have the power to make or ratify such a contract as is here in controversy—a proposition which we are far from desiring to sanction—these directors could not lawfully have done so under the circumstances presented. Commercial Wood Co. v. Northampton Portland Cement Co., 190 N. Y. 1, 82 N. E. 730, 123 Am. St. Rep. 529. At 12 o'clock the stockholders' meeting convened. The plaintiff then knew that the restraining order had been issued, but he told the marshal not to serve it until he could see whether it was necessary. When the meeting was called together and after a chairman had been elected, the plaintiff apparently concluded that the majority had not changed their minds. He called the marshal in, and the restraining order was served.

On the 2d of May it was replaced by a temporary injunction, again without requiring any bond from the plaintiff. In the meantime, all the parties, including the Hartford, had appeared and answered, and that company itself prayed that any or all persons including the Dixie be enjoined from interfering with or in any way preventing the carrying out the terms of the contract. The individual defendants being the representatives of the Blades group included in their answer a cross-complaint against Latham, Bush, Brooks, the Dixie, and the Hartford in which they asked that those persons and corporations be restrained pending the final hearing from taking any steps towards carrying out the alleged contract, that the Hartford be required to deposit with the clerk of the court all bonds, securities, money, books, records, papers, and property of every kind and description belonging to the Dixie which had been taken possession of or received in carrying out the terms and conditions of such alleged contract, and that upon final hearing, such property be ordered restored to the Dixie and the alleged contract be declared in fraud of the right of the stockhold-

ers of the Dixie, void and of no effect, and also that the plaintiff and the defendants Latham, Bush, and Brooks be required to make good to the Dixie by way of damages all sums expended by the Dixie and expenses incurred by it in carrying out the terms and conditions of such alleged contract. At the final hearing most of the witnesses were heard in open court, though there was taken upon commission the testimony of some of the most highly qualified of the experts who were examined as to the nature and effect of the contract.

At the conclusion of the case, the learned court below on the 20th of October, 1923, entered the decree for the permanent injunction here appealed from. It first sets forth certain findings of fact and states certain conclusions of law. As to many of the former, it is unnecessary to say anything than that in so far as they are inconsistent with what we have already said, we do not find anything in the testimony which sustains them, even giving to them all the weight that is usually and properly accorded to the findings of a judge who has seen and heard the witnesses. For the reasons already stated, neither the court below nor we are authorized to pass on the question of whether the proposed contract would or would not be highly beneficial to the Dixie. That is a matter which the law leaves to the decision of the Dixie's stockholders. It is immaterial that the majority of the stockholders of the Dixie wish to remove its present officers and most of its present directors and to replace them with others, even though the result will be to substitute inexperienced for experienced insurance men, or that in our view such action may probably do much harm to the Dixie and to those who hold stock in it. One who becomes a stockholder in a corporation takes the chance that the majority of his associates may sometimes act with little wisdom.

The injunctive part of the decree commands the Dixie Fire Insurance Company to carry out the contract and prohibits it and the individual defendants from doing anything at any time before the 24th of February, 1928, to interfere with its execution. It follows from what we have already said that in so decreeing the learned court below fell into error, that the Dixie never validly entered into the contract in question, and, as prayed in the cross-complaint of the individual defendants to the original bill, the alleged contract should be declared not to be the act of the Dixie and that the Hartford should be required to restore to the Dixie all property received by it under color of that contract.

Certain other provisions of the decree below are a striking illustration of the impossible situations into which a court puts itself when it attempts to substitute its judgment of what a corporation may wisely do for that of the majority of its stockholders. The Blades group, the defendants, are by it enjoined from voting in any meeting of stockholders or directors for any person to be a director or officer, who has been pledged or is known to intend to cause a breach of the contract in controversy or to endeavor to obstruct, interfere with, or prevent performance thereof, and from in any wise voting their majority stock so as to interfere with or embarrass or hinder the present board of directors and members of the executive committee as now consti-

tuted from faithfully carrying out and performing the obligations of the said contract during the life thereof. If the present board of directors and the members of the executive committee as now constituted are not to be interfered with in carrying out the obligations of the contract during the life thereof, presumably no one must do anything the effect of which is to turn them out of office, and yet the law of North Carolina declares that the directors, chosen by the stockholders, shall hold office for one year and until others are chosen or qualified in their stead. It is true that the corporation may classify its directors in respect to the time they will severally hold office; but, even so, the terms of office of at least one class must expire each year. Section 1144, Consolidated Statutes of North Carolina 1919.

[6] For more than 14 months the Dixie and the Hartford have been operating under the contract in controversy. In the testimony, in the briefs and in the arguments, much has been said as to the difficulty of disentangling their affairs and stating an account between them which shall be fair and just; all of which it may be parenthetically said tends to show how far out of the ordinary the terms of this contract are. However hard the task may be, the individual defendants are entitled to insist upon it. The Hartford chose to mix its business with that of the Dixie. In accordance with well-settled principles, it must separate them, seeing to it that in the process the Dixie loses nothing. There is nothing of injustice in imposing that obligation upon it. Before entering into such a contract as that now before us, it was bound to make sure that the parties who presumed to act for the Dixie had the legal right to do so. It could not rest upon the assertion of one of them that they had the power they assumed, even though the one who spoke was a lawyer of ability and reputation. Moreover, even before the contract was signed, upon the construction of the testimony most favorable to the Hartford, it had notice if not knowledge of facts which should have put it upon careful inquiry. It is clear that Bush and Bissell on the 9th of February expected to submit the contract to the stockholders of the Dixie, and Bissell arranged to have Prescott in Greensboro at the time they were to meet. It is hard to believe that Prescott at least did not learn before the 24th of the reason why the stockholders' meeting was postponed and did not know that there was among the stockholders of the Dixie much hesitation as to entering into the proposed contract, even if that hesitation had not yet to his knowledge taken the form of fixed opposition. It is absolutely certain that within a couple of weeks thereafter the Hartford had formal written notice that the majority of the stockholders of the Dixie were determined to resist the attempt to treat the contract as that of the Dixie's. The Hartford employed as its solicitor Mr. Brooks, one of its executive committee who dealt with it. The Dixie then under the control of the same individuals who made up the majority of that committee retained the same gentleman, and in their individual capacity were represented by his partners. In short, for nearly 15 months, the Hartford in every way identified itself with what we have been constrained to hold was an attempt to deprive the stockholders of the Dixie of their lawful rights. Clearly it took chanc-

es and cannot complain that, to its cost, they have gone against it. The Dixie cannot be saddled with any of the expenses of this litigation, whether they be lawyers' or stenographers' fees, compensation of expert witnesses, or what not. They must be borne by such of the executive committee and board of directors, parties to this cause who during this controversy have controlled defendants' actions.

It follows that the decree below must be reversed, and the injunction dissolved. The plaintiff must pay the costs above and below, and the cause must be remanded for further proceedings not inconsistent with this opinion.

Reversed.