**CAPRIOLA v. UNITED STATES, and three other cases.**

**Nos. 4652–4655.**

Circuit Court of Appeals, Seventh Circuit.
July 22, 1932.

Rehearing Denied Oct. 12, 1932.

6

North, Linscott, Gibboney & North, of Rockford, Ill. (Harry B. North and Charles H. Linscott, both of Rockford, Ill., of counsel), for appellants Capriola and Dodaro.

David D. Madden, of Rockford, Ill., for appellant Walsh.

John Elliott Byrne, of Chicago, Ill. (Frank R. Reid, of Aurora, Ill., of counsel), for appellant D'Agostin.

George E. Q. Johnson, U. S. Atty., and Victor E. La Rue, Asst. U. S. Atty., both of Chicago, Ill., and John H. Page, Asst. U. S. Atty., of Rockford, Ill.

Before EVANS and SPARKS, Circuit Judges, and WILKERSON, District Judge.

EVANS, Circuit Judge (after stating the facts as above).

The errors assigned may be somewhat grouped, although each appellant contends that his appeal necessitates a separate consideration of the record. This plan we have adopted. To avoid an opinion of unreasonable length, however, some of the assignments of error have been treated together. Moreover, only one opinion will be written in the four appeals.

The errors assigned are: (1) The insufficiency of the indictment to charge the crime of conspiracy against the respective appellants. (2) The admission in evidence over appellants' objections of (a) bills of lading, search warrants, and returns thereon, (b) attorneys' memoranda of proceedings in other cases, (c) informations and bail bonds, (d) certain exhibits, (e) testimony as to reputation of D'Agostin, (f) evidence of unrelated substantive crimes, (g) evidence of a fight at a picnic, and (h) remarks of a prosecuting attorney about Italians and other remarks upon introduction of certain exhibits. (3) Errors in the (a) refusal of cross-examination of government witnesses as to residence, (b) refusal to limit evidence to particular defendants, (c) failure to direct a verdict, allow motion in arrest of judgment (as to appellant Dodaro because jury found that he was known by name of Dodaro, whereas indictment called him Dodora), or grant a new trial, and (d) limiting of counsels' argument. (4) Errors in instructions: (a) failure to specifically limit evidence admitted against a certain defendant to that defendant, (b) failure to instruct jury not to consider picnic fight evidence which was stricken, and (c) erroneous instructions given to the jury after it retired. (5) Insufficiency of the evidence to support the verdict or the indictment. (6) Failure to establish one conspiracy. (7) Unfair trial because of number of defendants.

*Sufficiency of the Indictment.* The de-murrers to the indictment were based on numerous grounds. None of them are well taken. The indictment covers twenty printed pages, and the demurrers cover eleven of such pages. They are too long to be here set forth.

In this court counsel argued that there were many prejudicial statements set forth in the indictment, and appellants were thereby prejudiced. The usual and ordinary attack upon an indictment is because it is indefinite and lacking in specificity. That complaint is here changed to one that specified facts not necessary to the charge, which embarrassingly involved appellants, were made. In other words, the substance of the complaint is that the Government pleaded its evidence and did not confine itself to the language of the statute covering conspiracy.

█ We think the criticism unjust and unfair to the indictment and without merit in the case before us, even if true. An unusually large number of men were included in the alleged conspiracy. They apparently participated in this enterprise in different ways. Some of the conspirators were the distributors of the product through employment in saloons or drinking parlors where the intoxicating liquors were sold. Some were employed in transporting the intoxicating liquor, and these were specifically named. Others were engaged in supplying the residences with stills, etc., and actually operating the stills where the liquor was manufactured. Others were retained to provide protection for those actually engaged in the manufacture, sale or distribution of the liquor. Others were engaged in purchasing the material necessary to the production of the liquor. Still others purchased the material for the equipment of the stills, rectifiers, and steam boilers, while still others were engaged in furnishing the bail for those who were arrested. All of these facts are set forth, and the names of the participants given in the forepart of the indictment. This is followed by the formal definite charge wherein all of the defendants are named, and this statement was followed by one hundred and nine overt acts, none of which are insufficient or improper. Instead of being criticized, the indictment, it seems to us, can be commended in respect to one matter at least—it avoided the necessity of defendants' demanding a bill of particulars. The indictment is not bad simply because more overt acts were alleged than were necessary.

█ There was no prejudice arising from the indictment's being sent to the jury room. For the court in instructing the jury, at the

time he said he would send the indictment to them, stated:

"This is a criminal case. The government prefers its charges in the form of an indictment which, in this case, consists of a single count. The presentation of this indictment is no evidence of their guilt. It is not to be treated by you in any way as raising any kind of presumption or creating any kind of prejudice against the defendants. The indictment is the formal, written accusation of pleading by which the defendants are brought to trial. You must regard this indictment in that light and in no other light."

It was necessary for the jury to have before it a list of the defendants so that there would be no confusion on its part as to the names and identity of the individuals who were thus charged with violating the law. The fact that seven were found not guilty bears evidence of the wisdom of the court's policy in allowing the jury to have the indictment which furnished the names of all.

*The Sufficiency of the Evidence to Sustain the Indictment.* Appellants, singly and collectively, assert that the evidence fails to establish the conspiracy as charged in the indictment although admitting that many individual violations of the National Prohibition Act are disclosed.

Briefly stated, the proof showed that in Rockford, Illinois, there is a quarter commonly known as the "Italian Section," covering 12 to 15 blocks, wherein, during the period in question, 95 illicit stills (primary and secondary distilleries) were seized by the government officers. There was a marked similarity in the character and relative location of these stills. They were placed in houses of the residential type, with garages attached. In many instances similar vats were found in the basements and under the floors of these garages. Corn sugar and yeast were the principal ingredients for the mash manufactured. There likewise was similarity in the one and five-gallon tin containers which were found when searches and seizures were made. Appellant Dodaro, doing business under the name of Piemonte Bakery (a small bakery with no outside help), purchased from Standard Brands, Inc., 303,151 pounds of yeast, and no plausible explanation was offered for the acquisition of such a large quantity. Appellant Capriola, who was in the restaurant business, purchased from the Olive Can Company, 226,419 one-gallon and 10,881 five-gallon tin cans, the exact type of which prohibition agents found, time and again, with the liquor therein, when searches and seizures

were made. Appellant Capriola, in addition to buying the tin cans above mentioned, purchased 59 carloads of corn sugar of the kind used in making corn sugar mash. Appellant Dodaro, in addition to purchasing more than 300,000 pounds of yeast, purchased 116 carloads of corn sugar.

There was also testimony to the effect that several of the defendants acted in the capacity of salesmen; that there was a price fixed and agreed upon, namely $6 a gallon for quantities over 100 gallons and $6.25 a gallon for lesser amounts. Supplementing the evidence respecting uniformity of prices as indicative of a common enterprise, there was evidence to the effect that the owners of the individual distilleries had no quarrels among themselves. The absence of competition among producers pointed to an accepted distribution agency, the existence of which was established by other evidence.

There was also evidence of conversations had between agents of the government, whose identity was concealed, and various defendants, including at least three of the appellants, which, if true, leaves no room for speculation as to their guilty participation in the enterprise. This evidence disclosed the existence and effective working of a criminal conspiracy, which is but another name for an enterprise which is knowingly entered into and carried out, the object of which is to do some act which constitutes an offense against the laws of the United States.

The only legitimate inquiry presented by the record is as to the scope of the conspiracy and the names of the parties who participated in it. That the conspiracy charged in the indictment had for its object the commission of many crimes is quite apparent. Likewise, in the commission of some of the offenses there were no doubt other, and what might be called smaller, conspiracies between a smaller group of the defendants. To illustrate, the larger conspiracy contemplated the making, the manufacturing, and the selling of illegal liquor. This enterprise necessitated the purchase and acquisition of material—corn sugar, yeast, etc.—out of which the liquor was distilled. It also contemplated the transportation of the liquor, after it was manufactured, to the purchasers who bought large quantities, which required delivery. This phase of the enterprise called for the securing of trucks and men to drive them, of individuals who gave signals, warnings, and directions to such truck drivers. The same enterprise called in part for distributers in the form of bartenders or salesmen in "speak-

easies" and like places. It likewise needed the assistance of those who warned against raids, who "fixed" police officers, etc. The enterprise also required individuals who paid the various members of the various enterprises and who acted as salesmen and who protected the participants against arrest and imprisonment.

There is no denying the fact that the conspiracy as charged in the indictment encompassed the commission of the many substantive crimes, some committed by single individuals and others committed by several working in concert. These latter offenses doubtless constituted other conspiracies, but this did not make the indictment bad. Biemer v. U. S. (C. C. A.) 54 F.(2d) 1045. The only questions which this multitude of criminal offenses of various kinds described in the indictment raises are two: (a) The existence of the conspiracy as charged, and (b) the guilty participation of each appellant therein.

Concerning the guilty participation of each appellant in the larger conspiracy, the only one charged in the indictment, we have no doubt. There is some similarity between this case and that of Allen v. U. S. (C. C. A.) 4 F.(2d) 688. The language of the court in that case on page 691 of 4 F.(2d) applies here. It is not necessary that the prosecution show all of the conspirators were acquainted and working in each others' presence. "One defendant may know but one other member of the conspiracy. But if, knowing that others have combined to violate the law, a party knowingly cooperates to further the object of the conspiracy, he becomes a party thereto."

There is no doubt as to the guilty participation of Sam Capriola, Louis Dodaro, and William D'Agostin in this conspiracy. They were in fact its leaders, and they played bold if not heroic roles in the enterprise.

As to appellant Walsh, the evidence likewise connects him with the conspiracy, if the testimony of certain government witnesses be believed. We agree that there is room for argument respecting the reasonableness and probability of the story of the government witnesses. These stories, however, were neither improbable nor uncorroborated. If believed, appellant Walsh must be held with the other appellants as being a leader in this enterprise, although he did not actually fire the boilers, fill the bottles, nor transport the liquor from producer to consumer nor from producer to roadhouse. Rather did he provide the services which avoided interference by the public prosecutor, the public sheriff, and others charged with enforcement of the law.

As to all appellants, the evidence was sufficient to support the verdict.

*Errors in Admission of Evidence.* Many are the errors assigned because of the rulings on the admission of evidence.

To illustrate: Complaint is made because the court received over objection many search warrants, bail bonds, etc., given in connection with the arrest of still operators in this Italian section. One of the defendants, Moscarelli, was charged with being a party to this conspiracy, and, to establish his guilt, this evidence showing that he signed all the bail bonds for those who were arrested was offered. The jury found him guilty, and he did not appeal from the sentence pronounced on him. The evidence objected to was offered for the sole purpose of connecting him with the conspiracy. It had no relation to any of the appellants. The search warrants were received because the bail bonds which Moscarelli signed referred to the warrants, and it was only by an examination of the warrants that the character of the crime could be ascertained. For the purpose for which this evidence was offered, it was therefore proper. Likewise, appellants, who were not in any way affected by it, were not prejudiced.

Complaint is also made because the court received in evidence the manufacturer's and wholesaler's files, as well as certain railroad bills of lading, which corroborated the testimony of witnesses who told of the large sales of corn sugar, yeast, etc. In support of the objection, it is claimed that there was not a proper foundation laid for the admission of these exhibits. Under the rule laid down in Cub Fork Coal Co. v. Fairmont Glass Co. (C. C. A.) 19 F.(2d) 273, we find no error in receiving this testimony.

*Cross-Examination of Government Witnesses.* Relying upon the case of Alford v. United States, 282 U. S. 687, 51 S. Ct. 218, 75 L. Ed. 624, appellants complain because they were not permitted to inquire on cross-examination as to the residence of two government witnesses. The record fails to show any exception to the ruling of the court sustaining the objection to further inquiry concerning the residence of the witness Russell. Moreover, the witness had stated his residence. The specific question to which objection was sustained read:

"Now, isn't it a fact, Mr. Russell, right at the present time your wife and children are living in Amboy, Illinois?"

The district attorney says that he objected to such inquiry because he did not wish to have the members of the family of the witness molested or terrorized by any of the accused or others interested. Other testimony from other witnesses showed that some of the members of the conspiracy had resorted to terrorization and even physical violence, and the court was justified, if he was not under the duty, to prevent disclosures which could not affect the outcome of the case, but which would perhaps result in anxiety to, and molestation of members of, the families of the witnesses who testified against the accused. The case is therefore quite different from that of Alford v. United States, supra.

Concerning the cross-examination of the other government witness, the following occurred:

Witness: "* * * I am forty years old. I am married. I live in Detroit."

Q. "Whereabout in Detroit?" * * *

. . .(District attorney) "I object, what difference does it make here where he lives or has lived—it means a lot to them and their families."

Court: "Objection Sustained."

No exception was taken to this ruling. The witness further testified:

"I have been in the employ of the Government, except for one interval, since 1921. That interval was 1926 and '27 and part of '28. During that interval I was a salesman. For Nelson Brothers. * * * Before I commenced working for the United States in 1921 I was in business with my father * * * at Rice Lake, Wisconsin. * * * I came to Rockford on the 21st day of May, capacity of Special Agent of the Treasury Department * * * My duties were investigation of alleged conspiracies to violate the national prohibition and narcotic law. I remained in Rockford working there until the latter part of June, in the same year."

In addition to the contention that no exception was made to the court's ruling, we are of the opinion that no prejudice resulted therefrom. Moreover, the trial judge is in the best possible position to determine whether such information, if given, would subject the family of the accused to terrorization or personal violence. If the inquiry into the residence of the witness is not for the purpose of impeaching or discrediting him, or if the court is of the opinion that intimidation

be its object, then such inquiry should be, as it was here, stopped.

*Comments of the Prosecuting Attorney.* Throughout all the briefs of all appellants is a criticism directed to the conduct of the district attorney. The basis of this objection is an asserted attempt on the prosecutor's part to prejudice the jury against Italians. We have examined the voluminous record and from it reached the conclusion that this charge is not supported by the record.

There is not a single instance to which our attention has been called where there was any suggestion of an attempt to raise a prejudice against defendants as Italians. A map of the city of Rockford was received in evidence, and the particular section which was known as the "Italian Section" was marked. Reference was made to this "Italian Section." Such reference could not, and did not, reflect upon any one because of his Italian descent.

One instance is stressed by appellants. In the course of the examination of one of the witnesses, the prosecutor asked a question which was answered. Thereupon someone in the audience shouted, "That is a lie." The court then inquired "What is that?" There was no response. The court then commanded Peter Sanphillippo to come forward. The court then inquired, "What was that occurrence back there?" The bailiff said, "He said he lied." The court asked, "Who said that?" and the bailiff replied that it was Sanphillippo. The court said to Sanphillippo, "Did you say that?" Sanphillippo said, "I did." The district attorney then said, "Your Honor can see, they haven't any respect for the law or this Court." The court then said, "Have you no respect for this Court?" and Sanphillippo said, "Yes, I have." The jury was then excused, and further inquiry was had into the conduct of said Sanphillippo. The court, but only after the jury was excused, imposed punishment on Sanphillippo for contempt of court.

Appellants contend that such a proceeding established their claim of an unfair trial. Doubtless, the remark of Sanphillippo was wholly unexpected by both sides. Had the district attorney confined his observation to Sanphillippo, there would be no possible basis for criticism. However, this observation of the district attorney must be read in the light of the substance of the testimony of the witness who was describing a certain fight which occurred at a certain picnic, wherein he was a victim, and which picnic he attended as a prohibition agent.

We are not inclined to hold appellants to their failure to except to the prosecutor's remark. It was an unexpected outburst, and appellants' counsel were embarrassed by their client's conduct and so taken by surprize that their failure to except was excusable. However, it neither appears that prosecutor's remark was directed to all defendants (and Sanphillippo has not appealed) nor that it was prejudicial. Doubtless Sanphillippo's outburst was prejudicial, but the prosecution can hardly be chargeable with the prejudicial inference which such outburst occasioned.

█ *Separate Trials for Defendants.* The criticism is made that too many defendants were tried at one time to permit of a fair trial. The same question was considered in the case of Allen v. United States (C. C. A.) 4 F.(2d) 688. What was there said is applicable to the instant objection. Other cases, holding that the granting or refusing of a severance is discretionary with the trial judge, are collected in the footnote.[1]

The trial judge is in a better position than we to appreciate the danger of a mistrial or an unfair trial through the presence of too many defendants. Nevertheless, we suggest that there is danger of injustice being done, due to an overcrowded court room occasioned by too many defendants. In the case of United States v. Heitler (D. C.) 274 F. 401, 407, the court acknowledged its difficulty in trying a case wherein there were more than thirty defendants. No hard and fast rule can be announced, however. Practical difficulties likewise will be met when the court attempts to divide the defendants into two groups to be separately tried. It is hardly conceivable

that counsel for defendants in a criminal case will not object to any division that might be attempted. It is unreasonable and impossible for *each* defendant to expect a separate trial when the total number of conspirators runs up to a hundred. We express the opinion, however, that the grouping of the defendants and the giving of each group a separate trial may, under some circumstances, be promotive of the ends of justice.

█ *Limitation of Argument to Two Hours.* Appellants complain that:

"The court limited counsel collectively for all of the defendants to a period of two hours' time in which to present and summarize the evidence, which, owing to the great numbers of defendants and great numbers of witnesses, and the issues involved, was grossly insufficient time in which to properly, legally and intelligibly present and discuss the evidence, which fact deprived these appellants of their constitutional right to a fair and impartial trial."

The record contains no objection of any counsel to the ruling announcing a time limit. Nor is there any assignment of error based thereon.

It is well settled that the limitation of time for arguments of counsel is within the sound discretion of the trial court. There may however be an abuse of that discretion, which abuse constitutes reversible error. In the following cases it was held no abuse of discretion occurred: Medlin v. United States, 28 F.(2d) 663 (C. C. A. 5) (twenty minutes); Samuels v. United States, 232 F. 536 (C. C. A. 8) (thirty minutes); Wagman v. United States, 269 F. 568 (C. C. A. 6) (fifteen minutes); Moorehead v. United States, 270 F. 210 (C. C. A. 5) (one hour). In the following cases the trial court was held to have abused its discretion: Kolp v. United States, 2 F.(2d) 953 (C. C. A. 6) (ten minutes); Rossi v. United States, 9 F.(2d) 362 (C. C. A. 8) (fifteen minutes); and York v. United States, 299 F. 778 (C. C. A. 6) (twenty minutes).

In the instant case there was no abuse of discretion, and moreover there is no basis for the criticism. In other words, counsel may not apparently agree or acquiesce in the allotment of time for argument and afterwards complain that the time allowed was too short.

█ *Misnomer.* Appellant Dodaro separately complains because he was indicted under the name of Louis Dodora when in fact his real name is Luigi Dodaro, and also because his special plea raising this question

---

[1] Stilson v. U. S., 250 U. S. 583, 40 S. Ct. 28, 63 L. Ed. 1154; Ball v. U. S., 163 U. S. 662, 16 S. Ct. 1192, 41 L. Ed. 300; Milner v. U. S., 293 F. 590 (C. C. A.); Krause v. U. S., 147 F. 442 (C. C. A.); Richards v. U. S., 175 F. 911 (C. C. A.); Lee Dock v. U. S., 224 F. 431 (C. C. A.); Schwartzberg v. U. S., 241 F. 348 (C. C. A.); Oppenheim v. U. S., 241 F. 625 (C. C. A.); Baron v. U. S., 286 F. 822 (C. C. A.); Burns v. U. S., 279 F. 982 (C. C. A.); Talbott v. U. S., 208 F. 144 (C. C. A.); Wood v. U. S., 204 F. 55 (C. C. A.); Ader v. U. S., 284 F. 13 (C. C. A.); Skolnik v. U. S., 284 F. 13 (C. C. A.); O'Brien v. U. S., 299 F. 568 (C. C. A. 7); Heike v. U. S., 227 U. S. 131, 33 S. Ct. 226, 57 L. Ed. 450, Ann. Cas. 1914C, 128; Hammerschmidt v. U. S., 265 U. S. 182, 44 S. Ct. 511, 68 L. Ed. 968; Soblowski v. U. S., 271 F. 294 (C. C. A. 2); Belden v. U. S., 223 F. 726 (C. C. A.); Brady v. U. S., 39 F.(2d) 312 (C. C. A.); Cochran v. U. S., 41 F.(2d) 193 (C. C. A.); Latsos v. U. S., 45 F.(2d) 949 (C. C. A.); Moore v. U. S., 2 F.(2d) 839 (C. C. A. 7); Waldeck v. U. S., 2 F. (2d) 243 (C. C. A. 7); Allen v. U. S., 4 F.(2d) 688 (C. C. A. 7); Sullivan v. U. S., 7 F.(2d) 355 (C. C. A.); Buchanan v. U. S., 15 F.(2d) 496 (C. C. A.); Tincher v. U. S., 11 F.(2d) 18 (C. C. A.); Olmstead v. U. S., 277 U. S. 438, 48 S. Ct. 564, 72 L. Ed. 944, 66 A. L. R. 376; Raarup v. U. S., 23 F.(2d) 547 (C. C. A.); Isbell v. U. S., 26 F.(2d) 24 (C. C. A.).

was not separately tried. The evidence showed "the Latin Luigi is Louis in English" and that said defendant was generally known as Louis. He was also identified by one witness who knew him as Louis Dedora. There is no question but that the appellant was the party indicted. Common sense and judicial precedent, alike, sustain the view that indictments are not subject to attack simply because of a mistake in the spelling or the initials of one of the parties. Faust v. United States, 163 U. S. 452, 16 S. Ct. 1112, 41 L. Ed. 224; Alexis v. United States (C. C. A.) 129 F. 60; Alexander v. Commonwealth, 105 Pa. 1; 45 Corpus Juris, "Names," page 384, footnote 14. The issues of fact as to the meaning of the words "Luigi" and "Louis," as well as the existence of misnomers in the indictment, were left to the jury for decision. We think the action was more favorable to appellant than the record warranted.

**Good Reputation.** The court charged the jury:

"Certain evidence has been introduced in this case, on behalf of some of the defendants, in support of their previous reputation for being law abiding citizens. The law required that the jury should consider that evidence and give it such weight as they see fit. I wish to caution you, however, that the mere circumstance that the person has borne a good reputation prior to the time that he was accused of complicity in a crime should not be used by the jury as a means of excusing the commission of the crime, or showing leniency to one whom the evidence otherwise, in connection with his evidence of good character, entirely satisfied the jury of the matter of his guilt."

Appellant (D'Agostin) claims that he is in a worse position than if he had offered no testimony as to his good reputation. We think not.

In Hayes v. United States, 32 F. 662, 665 (C. C.), the court said:

"Again, it appears in the testimony that some of the witnesses testified to defendant's previous good character, and upon this the court charged in these words: 'And if you believe him guilty, let not the fact that bankers and business men have testified that he is a man of integrity, by which *they* mean, probably, that he pays his debts, influence your verdict, or discourage you in the discharge of your duty.' That is unquestionably correct as a matter of law; if the jury believe the defendant guilty, no previous good character, however proved, would be any excuse for ac-

quitting him. And if it be said that there is a covert fling at the witnesses' criterion of a man's integrity and character, that does not change the correctness of the rule of law laid down."

In Baugh v. United States, 27 F.(2d) 257, 261 (C. C. A. 9), the trial court charged: "It [evidence of good reputation] is competent testimony, and you should take it and consider it and give it such weight as appeals to your judgment."

This charge was upheld. See, also, Haffa v. United States, 36 F.(2d) 1 (C. C. A. 7); Allen v. U. S., 4 F.(2d) 688 (C. C. A. 7); Kreiner v. U. S. (C. C. A.) 11 F.(2d) 722; White v. State, 164 Ark. 517, 262 S. W. 338; State v. Greenberg, 92 Conn. 657, 103 A. 897; Jeffers v. State, 145 Ga. 74, 88 S. E. 571; People v. Best, 218 Mich. 141, 187 N. W. 393; McGillis v. State, 177 Wis. 522, 188 N. W. 597.

**Fair Trial.** The fairness of the trial is challenged because of what was said after the jury retired the first time. Twice did it return to the courtroom to secure additional instructions. The first time it returned on its own initiative and sought instructions respecting the character of the proof necessary to establish a conspiracy. As one of the jurors put it, "Does the conspiracy itself have to be in writing or is it verbal between the different parties combined together?"

After the lapse of some twenty-five hours from the time the jury first retired, the court summoned it into the courtroom and inquired if further instructions were desired. One juror replied that the jury was somewhat confused as to what a conspiracy was, and another one asked for a further definition of "what a conspiracy is." The court then gave further instruction and ended by suggesting that the jury be given a rest to resume consideration of the case the next morning. He said,

"Now let me ask you this question: You have been out twenty-five hours or over, and you are undoubtedly very tired physically, and mentally fagged no doubt. I know I would be if I had been up. Is it the desire of the jury to retire to some hotel and then return when your minds are clear to deliberate further?"

One juror spoke up and said, "If your Honor please, I would rather go to the jury room and stay for another hour."

Another juror said, "With these instructions now while they are fresh in our minds,

we certainly ought to be able to do something."

Thereupon the jury retired and thereafter brought in the verdict finding some of the defendants guilty and others not guilty. It also found Luigi Dodaro was known and called by the name of Louis Dodaro.

A careful study of the record dealing with the charge of the court to the jury and the action of the jury in seeking information calls for commendation of both court and jury. The instructions of the court on the subject of conspiracy, as well as on the question of what is proof of conspiracy, were clear, accurate, and enlightening. The questions propounded by the jurors indicated an understanding and appreciation of the determinative issues of the controversy. They bespeak the presence of a conscientious desire on the part of these twelve men, who had for over three weeks heard the evidence in this case, to meet their obligations fully.

The fact that none of the counsel objected in any respect to the instructions given by Judge Woodward in response to the questions submitted confirms our opinion of their fairness and their accuracy.

Inasmuch as all appellants have devoted many pages of their briefs to the claim that the trial was not a fair one, more consideration has been given to the argument that the prosecutor appealed to race prejudice to convict defendants, most of whom were Italians, than the record seems to justify. The fundamental weakness of appellants' argument is traceable to the fact that they have failed to distinguish between a prejudice which arises from acts and a prejudice which arises over the nationality of the actors. It was not the fact that a section in the city of Rockford was called an "Italian Section," but what occurred in that section which gave rise to the prejudice complained of. When it appeared that in a certain section covering three to four blocks square, more crimes were committed than in all the rest of the city of Rockford, when it appeared that in this small section ninety-five stills were seized and arrests and trials for law violations were counted by the hundreds, a prejudice, and a justifiable one, against the residents thereof, may legitimately be expected to arise. But the prejudice is one which arises in the law abiding citizen against lawlessness rather than against nationality.

The trial of a law suit seldom calls for the passing of bouquets by the adversaries or their counsel. Rather do we find the advocate calling a spade a spade, and this is particularly true in criminal cases. The inferences which arose from the fact that a small baker purchased over 303,000 pounds of yeast and never offered one word of explanation therefor; that a small restaurant keeper purchased 226,400 one-gallon cans, used by all of the distillers, without taking the stand to explain it; that $50 a truck load was the graft imposed upon one who drove his liquor through Rockford; that violence and lawless conduct followed the efforts to stamp out this vice section; that raids were met by a fusillade of bullets fired from outside into the raided premises being searched by the prohibition agents, no doubt aroused in the law abiding citizen something akin to prejudice.

It can not be denied that the great majority of those who participated in this lawless warfare were Italians. But the record fails to show a word of derision directed at the Italian as such, but only against the wrongful acts of a group by no means representative of the race. Some of the group were not even of Italian descent. The verdict, too, showed the absence of race prejudice. For of those acquitted the majority carried Italian names, and we assume were of Italian descent.

As to the alleged confusion resulting from the trial of so many at one time, more need hardly be said. However, it might be observed in passing that the number of participants in a criminal conspiracy is not a matter of the prosecutor's choosing. If those who conspire to violate the law dislike a trial with so many defendants, they should reduce the scope of their conspiracy and lessen the field of its operation, or better still, abandon the enterprise before they enter upon it.

There are numerous other assignments of error presented by one or more, or all of the appellants. They have all been studied and with the result that they are one and all rejected.

The judgment is affirmed.