317 F.2d 249
 6 A.L.R.3d 582
 Lester E. BUTLER et al., Appellants,
v.
UNITED STATES of America. Nos. 16918-16927, 16942, 16945, 16948-16952.
 United States Court of Appeals Eighth Circuit.
 May 10, 1963, Rehearing Denied June 4, 1963.
 
 Sam Houston Allen, Van Nuys, Cal., for Lester E. Butler, and others, appellants.
 Julius Lucius Echeles, Chicago, Ill., for Dodson Benedec, and others, appellants; and Frank W. Oliver, Chicago, Ill., on the brief.
 Robert Vogel, Sp. Asst. Atty. Gen., Mandan, N.D., for appellee.
 Before JOHNSEN, Chief Judge, MATTHES, Circuit Judge, and HARPER, District Judge.
 MATTHES, Circuit Judge.
 
 
 1
 An indictment in 33 counts was returned and filed in the United States District Court for the District of North Dakota on Cotober 24, 1960, charging Lenders Service Company, Inc., a corporation, and 36 individual defendants with violation of the mail fraud statute, 18 U.S.C.A. 1341.[1]
 
 
 2
 The scheme forming the basis for the mail fraud violations involved advance fee payments and fraudulent activities similar to those described in Wolpa v. United States, 8 Cir., 86 F.2d 35 (1936), cert. denied, 299 U.S. 611, 57 S.Ct. 317, 81 L.Ed. 451 (1937), the more recent case of Goodman v. United States, 8 Cir., 273 F.2d 853 (1960), and is almost identical to the scheme described in the indictment in United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962).[2]
 
 
 3
 Count 1 of the indictment alleged that on or about June 1, 1959, and continuing to on or about June 1, 1960, defendants devised and intended to devise a scheme or artifice to defraud and for the purpose of obtaining money by means of false and fraudulent pretenses, representations and promises from numerous persons, many of whom were named in the indictment. The details of the fraudulent scheme were described in Count 1, and incorporated by reference in the other 32 counts. In each of the 33 counts, a separate letter, mailed or caused to be mailed by defendants on a certain date for the purpose of executing the scheme, was alleged in the words of 18 U.S.C.A. 1341.[3]
 
 
 4
 The corporate defendant entered a plea of nolo contendere, 4 of the individuals named as defendants were not apprehended, and 2 of the named defendants died prior to trial. The remaining 30 defendants were tried by jury before the Honorable George S. Register, Chief Judge of the District Court for North Dakota. The trial commenced on March 14, 1961, the case was submitted to the jury on July 31, and verdicts were returned on August 9, 1961, finding 10 defendants not guilty and 20 defendants guilty. Eighteen of the convicted defendants filed notices of appeal from the judgments of conviction entered pursuant to the verdicts; however, John A. Miller subsequently abandoned his appeal. Donald W. Majerus and F. Bennett Spencer, also found guilty, did not appeal.
 
 
 5
 The 17 appellants will, for the purpose of this appeal, be placed in two groups. Eleven of them, namely, Lester E. Butler, Charles S. Herndon, Laurence J. Brandon, Veit A. Hain, Jr., Harvey S. Cova, Martin H. Rye, H. Eugene Gilbert, Alan C. Springer, William E. Mitchell, Kalman T. Taggart and John E. Ringger, hereinafter sometimes referred to as Butler, et al., are represented on appeal by Sam Houston Allen, an attorney of Van Nuys, California. Mr. Allen represented appellants Harvey S. Cova and Martin H. Rye and defendant Samuel Vizzini, who was acquitted in the trial of the case. The remaining 6 appellants, namely, Dodson Benedec, Sidney L. Schwarz, Robert Eakins, Leonard Ostrowsky, Jerome Stadin and Peter J. Wangberg, hereinafter sometimes referred to as Benedec, et al., are represented on appeal by Julius Lucius Echeles and Frank W. Oliver, attorneys of Chicago, Illinois. Neither of these attorneys represented any defendant in the court below.
 
 
 6
 The sufficiency of the evidence to establish-- 1) the formation and existence of the scheme or artifice to defraud, and 2) that the mails were used for the purpose of executing such scheme, is not challenged. Indeed, on oral argument Mr. Allen and Mr. Echeles conceded there was an adequate evidentiary basis to establish these elements of the offense. Nonetheless, because of the nature of the contentions of error, we have examined the voluminous record with painstaking care.[4]
 
 
 7
 Defendant Lenders Service Company, Inc. (Lenders) was a nation-wide corporation, having its general offices in Little Rock, Arkansas. It purchased the assets and took over the business of Lenders Service Corporation of Los Angeles, California, which apparently was engaged in a similar type of business. Purportedly, Lenders was organized for the purpose of assisting small business firms in obtaining needed financing. It began operation on or about June 1, 1959, ceased doing business on May 27, 1960, and became the subject of bankruptcy proceedings. The company operated from its home office and seven regional offices located in Los Angeles, California, Denver, Colorado, Dallas, Texas, Atlanta, Georgia, Cleveland, Ohio, Chicago, Illinois, and New York City, New York. The individual defendants were the officers, regional directors and field representatives or salesmen.[5]
 
 
 8
 Using telephone directories to secure the names and addresses of potential customers, appellants caused millions of solicitation letters to be mailed to small business men throughout the entire nation. The business men who responded were shortly thereafter contacted by a field representative (salesman). Armed with an attractive and pictorialized 'sales kit' containing information about Lenders and statements from supposedly satisfied customers, the field representative resorted to one of at least three distinct approaches to collect an advance fee and to obtain the prospect's signature on a 'financial service agreement' with Lenders.[6] On occasion the filed representative would lead the prospect to believe that Lenders itself was a lending agency and that it would make the loan in consideration for the advance fee and a completion fee to be paid when the transaction was closed. Other field representatives, making frequent reference to an ambiguous clause in the contract that provided a refund would be made if the contract were not accepted by Lenders, would promise the prospect that he would either receive a loan or a refund of the advance fee. Other prospects were told that they couldn't lose because Lenders would not accept a contract unless it was virtually assured of obtaining a loan for the prospect.
 
 
 9
 Signed contracts were forwarded to a Lenders' office for approval, where in virtually every instance the contract was accepted, in apparent disregard of the financial feasibility of attempting to secure a loan for the applicant. Approximately 4,200 contracts were accepted and over $1,250,000 was collected in advance fee payments.
 
 
 10
 Dealing almost exclusively with business men who were borderline cases and whose financial qualifications for the loans they desired were unattractive, Lenders' superficial efforts to procure financing were foredoomed to failure-- a failure that in actuality is reflected in the procuring of loans for less than one per cent of applicants from whom an advance fee had been obtained. Although this ratio existed from the inception of the operation, appellants continued by use of the mails to solicit prospects, continued to advertise their success as financial consultants and loan placement experts, and continued to inviegle the unsuspecting and unwary small business firms into payment of the advance fees.
 
 
 11
 After the advance fee had been paid, and the contract accepted, the applicant was besieged with forms to be completed and was repeatedly assured that Lenders was in the process of obtaining the loan. The pattern of operation pursued by appellants was designed to and did lull the applicant into feeling that the loan would soon be forthcoming. But in regard to substantially all of the accepted contracts, the ultimate result was 'no loan and no refund.'
 
 
 12
 Some dissatisfied applicants became very irate and continued their efforts to obtain refunds from appellants. Others apparently accepted their fate after receiving a standard response to their complaints in which they were informed that they should have read their contracts more carefully; or that the field representatives were independent contractors and Lenders could not be responsible for any exaggerated or false claims made by such salesmen; or that the applicants had not complied with the contracts by not providing exact and accurate information.
 
 
 13
 In summary, even assuming that Lenders was initially motivated by legitimate purposes, it became apparent very early in the venture that fraudulent and deceptive means were being pursued in securing the advance fee payments. However, instead of initiating effective corrective measures to alleviate the fraudulent practices, appellants followed a course which actually intensified the wrongdoing. Exemplifying the limits to which the scheme was extended is the following statement made by one of the appellants at a sales training session held in mid-October, 1959, 'Gentlemen, we're giving you a license to steal.' As Mr. Echeles and Mr. Oliver aptly and candidly stated in their brief on this appeal:
 
 
 14
 'When neither loan nor refund was forthcoming, the complaining would-be borrower was put off with lulling letters. * * * The records introduced into evidence by the government showed the ratio of actual loans to applications so infinitesimal as to impel the conclusion that whatever the state of knowledge of the Lenders' representative when he called on the borrower, the persons responsible for the good faith execution of the contract never intended to perform according to its ostensive spirit.'
 
 CONTENTIONS OF ERROR
 
 15
 * Although Benedec, et al. do not challenge the proof of the fraudulent scheme nor the use of the mails pursuant thereto, they do contend that the Government's evidence failed to identify them as the persons named in the indictment. More precisely, it is claimed that, notwithstanding the existence of evidence which established that persons bearing the names of these appellants were associated with Lenders, no witness connected such names with the corporeal defendants on trial.
 
 
 16
 The authorities dealing with the general subject of identification of the accused, and particularly with the quantum and quality of proof required to establish this element of a criminal case, uniformly hold that proof of the identity of the person who committed the offense is essential to a conviction. 20 Am.Jur., Evidence 1222 (1939); 22A C.J.S. Criminal Law 616 (1961); 1 Underhill, Criminal Evidence 127 (5th ed. 1956); 1 Conrad, Modern Trial Evidence 57 (1956). The same authorities make it abundantly clear that identification may be established and inferred from all of the facts and circumstances in evidence. Compare also Walker v. United States, 6 Cir., 254 F.2d 509 (1958).
 
 
 17
 The argument advanced in support of the identity issue, raised for the first time on appeal, is completely rebutted and dispelled by examination of the record in totality. At no phase of the case from and including the arraignment of these appellants to and including the pronouncement of judgment and the imposition of sentences was the question of identity made an issue either by appellants or by their able and experienced trial lawyers.[7] Indeed, appellants Eakins and Wangberg were identified by their lawyer in his opening statement to the jury prior to the introduction of any evidence, and appellant Stadin was positively identified by a Government witness under cross- examination by Stadin's trial counsel. It is inconceivable that these appellants, individually or collectively, would have sat mute and subjected themselves to the ordeals of the lengthy trial if they had sincerely and in good faith believed they were being tried for an offense with which they were completely disassociated.
 
 
 18
 In his reply brief, Mr. Echeles cites United States v. Metz, 6 Cir., 312 F.2d 199 (1963), and Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), cases which obviously are valid pronouncements of the law concerning the necessity for proper identification, but which equally obviously have no application to this case. From the defense offered by these appellants to the charges and in light of all the facts and circumstances, the conclusion is impelled that they tacitly admitted their identity and participation in the fraudulent operations. Certainly, if the matter of identity had been a controverted and litigated issue, or if the defendants had requested that the question be submitted, the evidence would have justified its submission to the jury.
 
 II
 
 19
 The first assignment of error presented in the brief of appellants Butler, et al. is that the indictment, in defining the alleged scheme, actually charged the commission of numerous offenses of obtaining money by false pretenses, and that consequently the failure of the Government to inform defendants of the names of all of the alleged victims deprived defendants of due process of law.[8] More precisely, and in an attempt to delineate this assignment of error, appellants contend: (1) 'The charge, by employing the past tense in the description of the purported scheme, in effect amounted to accusations of obtaining money by false pretenses;' (2) 'The Government tried the case as though the defendants were charged with obtaining money by false pretenses, thus leading the jury so to believe;' (3) 'The court's admonitions and instructions subordinated the scheme to the acts constituting false pretense;' (4) 'The jury's verdict rested on the assumption that this was a false pretense case.'
 
 
 20
 These contentions are patently without merit. As we have previously observed in summary reference to the indictment, it alleges that defendants devised a scheme and artifice to defraud and for the purpose of obtaining money by means of false and fraudulent pretenses, representations and promises from 36 named victims, 'and other persons, hereinafter described as 'victims." Following this general allegation, and in ten separate paragraphs, the specific component activities of defendants, all of which formed a part of the scheme to defraud, are delinesated with clarity and definiteness so as to portray an accurate picture of the conduct charged to defendants. While each of the 33 counts was based on a separate alleged mailing, the scheme charged was the same in all counts.
 
 
 21
 Any doubt as to the sufficiency of the indictment to charge a violation of the mail fraud statute has been completely and with finality dispelled and removed by the opinion of the Supreme Court of the United States in United States v. Sampson, supra, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136. The indictment here closely resembles the indictment in Sampson, which also employed the past tense in the description of the fraudulent scheme. The controverted issue in Sampson-- a question also repeatedly raised here at the trial but not specifically pressed on appeal-- was whether the indictment was sufficient to charge an offense under the mail fraud statute since it appeared on the face of the indictment that the victims had parted with their money prior to the mailing of an acceptance of the contract. In reversing the judgment of the district court which dismissed the indictment, the Supreme Court used this language, which is particularly apropos to our case:
 
 
 22
 'Moreover, as pointed out above, the indictment in this case alleged that the defendants' scheme contemplated from the start the commission of fraudulent activities which were to be and actually were carried out both before and after the money was obtained from the victims. The indictment specifically alleged that the signed copies of the accepted applications and the covering letters were mailed by the defendants to the victims for the purpose of lulling them by assurances that the promised services would be performed. We cannot hold that such a deliberate and planned use of the United States mails by defendants engaged in a nationwide, fraudulent scheme in pursuance of a previously formulated plan could not, if established by evidence, be found by a jury under proper instructions to be 'for the purpose of executing' a scheme within the meaning of the mail fraud statute. For these reasons, we hold that it was error for the District Court to dismiss these 34 substantive counts.' 371 U.S. at 80-81, 83 S.Ct. at 176.
 
 
 23
 Since the instant indictment charged a scheme to defraud not only the named individuals and firms but also other persons throughout the United States, the question is governed by the rule announced in Wolpa v. United States, supra, 86 F.2d 35, 39, and Gould v. United States, 8 Cir., 209 F. 730, 735 (1913),[9] and the failure of the indictment to disclose the names of all victims of the scheme does not render it vulnerable to attack. Neither did the trial court abuse its discretion in failing to require the Government to furnish the names of the victim witnesses in a bill of particulars, for the indictment 'was sufficiently specific to apprise defendants of the nature of the charge against them and to permit them to prepare adequately for trial.' United States v. Lebron, 2 Cir., 222 F.2d 531, 535 (1955), cert. denied, 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774 (1955).
 
 
 24
 Moreover, in the setting of what actually transpired, the argument that appellants were prejudiced is more imaginary than real. It appears that well in advance of trial, and pursuant to notice to all defense attorneys, all of the corporate records of Lenders, which included pre-numbered exhibits containing the names of victim witnesses, were made available to defense counsel. Additionally, on the evening of each trial day, the United States Attorney furnished defense counsel with a list of witnesses he proposed to offer the following day. Thus it becomes self-evident that appellants' defense was in no respect prejudiced or jeopardized because names of Government witnesses were not provided by more formalistic means.
 
 
 25
 Analysis of the contentions supporting the various specifically denominated subheadings under this assignment deads us to the inescapable conclusion that the allegations, both individually and collectively, are without merit and that, in regard to this assignment of error, appellants were fairly and properly indicted and tried under the mail fraud statute.
 
 III
 
 26
 Of the 11 appellants represented by Mr. Allen on appeal, 7 contend that the time limitation placed upon their attorneys' summation argument to the jury was unduly restricted, that the time allotment was discriminatory as between defendants themselves, and that such limitation infringed upon their constitutional right to be represented by counsel in a full presentation of their case to the jury. Since Mr. Echeles and Mr. Oliver adopt this argument by reference, presumably all 6 appellants represented by them are also attacking the time limitation. However, the record clearly reveals that trial counsel for appellants, with the exception of Mr. Allen, and with slight dissatisfaction indicated by Mr. Breidenbach and Mr. Sperry, agreed to the time allocated to them for closing arguments. Thus only 2 appellants represented by Mr. Echeles (represented by Breidenbach below) and 7 represented by Mr. Allen (represented by Allen, Breidenbach, or Sperry below) have claims even worthy of appellate consideration. See infra, fn. 11.
 
 
 27
 It is axiomatic that the limitation of time for arguments of counsel is within the sound discretion of the trial judge. 5 Wharton, Criminal Law and Procedure 2077 (Anderson 1957); 53 Am.Jur., Trial 461 (1945); 88 C.J.S. Trial 168 (1955); Capriola v. United States, 7 Cir., 61 F.2d 5, 11 (1932), cert. denied, 287 U.S. 671, 53 S.Ct. 315, 77 L.Ed. 579 (1933); Samuels v. United States, 8 Cir., 232 F. 536, 543 (1916). In Capriola, supra, a case involving 59 defendants and alleging 109 overt acts, the trial court's limitation of all counsel to a total of two hours for final argument was upheld and certiorari to the United States Supreme Court was denied. Here, in initiating the discussion on the time to be given for summation, the court stated:
 
 
 28
 'I have given this matter a lot of consideration because I do want to be fair * * * still we must bear in mind the fact that there are so many attorneys here that I feel that if it's at all possible to do it, that we should try to conclude the arguments within a period of a week. I also feel that the Government is entitled to equal time. Now, this is the conclusion that I have reached and I am perfectly willing to listen to discussion. * * * I feel that any counsel who represents one defendant should be limited to one hour; * * * two defendants * * * an hour and a quarter. * * * Those representing three defendants should be allowed one and one-half hours. * * * Mr. Rosenberg (6 defendants) * * * should be allowed a maximum of two hours, and * * * Mr. Breidenbach (7 defendants) should be allowed a maximum of two and one-half hours. 'Now, that totals fifteen and one-half hours.'[10] After a lengthy discussion during which the majority of the defense attorney expressed satisfaction with the time allocation previously announced, the court issued an order consistent with its first intimation, 'with one exception; that as to those attorneys who have only one client, the time limit will be extended in each of those instances to one hour and fifteen minutes, instead of one hour.'
 
 
 29
 A reversal may be required where counsel is restricted within unreasonable bounds so that he is unable to fully and fairly present his case. But where, as here, the trial court carefully evaluated the time requirements from its vantage point, discussed the various possibilities of time allocation with teh trial attorneys; obtained approval of a time allocation schedule from the majority of them, and then allowed the defense a total of three full court days for summation, we cannot hold that the trial court abused its discretion.
 
 IV
 
 30
 Appellant Springer contends that the court erred in denying his request to release and discharge his attorney and in refusing to permit him to represent himself and conduct his own defense. On March 30, 1961, in the third week of trial, appellant Springer made the first of several requests to release his attorney, Mr. Edward M. Cohen of Minneapolis, Minnesota, whom he had employed in advance of the trial. Although stating that he did not doubt the ability of Mr. Cohen to represent him adequately, Springer asserted that his inability to pay the promised legal fee to his attorney had created an embarrassing situation, and the desired amiable attorney-client relationship was in jeopardy. Mr. Cohen opposed being released, stating that he felt an obligation toward Mr. Springer 'in this trial as a lawyer and as a citizen' and that Mr. Springer 'will get more than adequate representation-- as best I can.' As a demonstration of his sincerity, Mr. Cohen then volunteered to terminate his paid service as of that point, but to continue to represent Springer gratuitously throughout the remainder of the trial. After carefully analyzing Springer's request in light of the circumstances, the court denied it and agreed to a plan whereby Mr. Cohen would continue as the prime attorney for Mr. Springer, with Mr. Rosenberg, an attorney for six other defendants in the case, acting as associate counsel to represent Springer on those occasions when Mr. Cohen would be unable to attend the trial. In a detailed memorandum opinion, the court stated the reasons for its ruling, including such pertinent factors as the inability of Springer to properly defend himself, the stage of the litigation and the consequences of appointing a new attornet after three weeks of trial had transpired, evidence that the request was not made in good faith, and the continued fine representation provided by Mr. Cohen.
 
 
 31
 We are fully cognizant of an accused's constitutional right to be represented by counsel, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and of his correlative right to intellingently and understandably waive counsel and conduct his own defense if he so desires. Adams v. United States ex rel. McCann, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed.2d 268 (1942); Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); United States v. Cantor, 2 Cir., 217 F.2d 536 (1954). But the statutory right to dispense with counsel is subject to the sound discretion of the court once the trial has commenced. 28 U.S.C.A. 1654; Brown v. United States, 105 U.S.App.D.C. 77, 264 F.2d 363 (1959), cert. denied, 360 U.S. 911, 79 S.Ct. 1299, 3 L.Ed.2d 1262 (1959); United States v. Paccione, 2 Cir.,224 F.2d 801 (1955), cert. denied, 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788 (1955); United States v. Mitchell, 2 Cir., 138 F.2d 831 (1943), cert. denied, 321 U.S. 794, 64 S.Ct. 785, 88 L.Ed. 1083 (1944). The denial of a motion to discharge counsel will not support reversal unless there is a showing that the denial was prejudicial to defendant. Brown v. United States, supra,105 U.S.App.D.C. 77, 264 F.2d 363; United States ex rel. Hyde v. McMann, 2 Cir., 263 F.2d 940 (1959), cert. denied, 360 U.S. 937, 79 S.Ct. 1462, 3 L.Ed.2d 1549 (1959).
 
 
 32
 Our careful study of the record satisfies us that the court did not abuse its discretion, and that contrary to the unwarranted charges asserted on this appeal, Mr. Cohen and Mr. Rosenberg continued to provide able and tenacious representation in behalf of Springer throughout the long and arduous trial. Like the trial court, we are convinced that Springer's request was not made in good faith, and that the case was far too complicated to allow self-representation. Springer's attorney in this court places great emphasis on the sheer amount of time consumed by various attorneys on cross-examination, insinuating that Mr. Cohen was lax in his duty since he was not the most vociferous attorney at the trial. But such a quantitative test is meaningless, as may be indicated by the acquittal of various defendants in this case whose attorneys were far more reticent than either Mr. Allen or Mr. Cohen. Defending Springer, the former president and leading organizer of Lenders, was not an easy task, but Mr. Cohen displayed sincere interest, more than adequate ability, and was quick to respond whenever a witness directly implicated his client. Indeed, the court's refusal to grant appellant Springer's request to release Mr. Cohen, rather than being prejudicial, actually assured
 
 V
 
 33
 The next contention advanced by Butler, et al. constitutes a broadside attack upon the representation provided by all of the lawyers representing all of the defendants, except that afforded by counsel who represented appellants Rye and Cova and who is the author of the brief which presents this claim of error. This assignment, grounded upon the supposition that the 'stand-in representation' afforded these appellants, other than Rye and Cova, violated the Sixth Amendment, is, like others, raised for the first time on appeal. The contention springs from the failure of self-employed or court-appointed attorneys to be present at all trial sessions, and assumes that other lawyers who represented defendants when their regular attorney was absent failed to provide adequate representation, leading to the violation of the constitutional right to counsel.
 
 
 34
 The history of the proceedings antedating the trial, amplified by the trial events will serve to demonstrate the fallacy of this assignment. It should be observed that defendants were represented by counsel of their own choosing or by court-appointed counsel, as shown in the margin.[11]
 
 
 35
 Pursuant to notice, without objection and by consent of defendants, a pre-trial conference was held by the court on March 2, 1961. The conference, attended by attorneys representing the present complaining parties, resulted in the issuance of a number of orders, among them one dealing with temporary absences of attorneys, as follows:
 
 
 36
 'Should any counsel desire to be temporarily absent during any part of the trial, an adequate record shall be made in advance concerning the same; the respective client or clients must consent thereto, in advance, in writing, which consent shall be filed with the Clerk of this Court, and arrangements shall be made for representation of such client or clients by other counsel who are present during such absence, all of which record shall be in writing, consented to by the defendant or defendants involved, in person, and duly filed with the Clerk.'
 
 
 37
 We thus have a situation where the court, recognizing the vicissitudes of a lengthy trial, entered an order, obviously at the behest of counsel and with the approval of all defendants, that was designed to prevent an extreme hardship on the members of the bar who had been appointed to represent certain defendants. But manifestly, the court was careful not to subvert the rights of defendants to the desire of any of the attorneys.
 
 
 38
 In pursuance of the foregoing order, written instruments were executed by and filed on behalf of defendants, consenting to the temporary absence of self-selected or court-appointed attorneys and to being represented by another attorney in the case during such temporary absence of the frgular attorney. In each instance the attorney so designated consented to represent the defendant in question.[12] There were numerous written consents filed during the course of the trial. Although the terms of the pre-trial order were not literally complied with by a written consent on every occasion on which a substitute attorney appeared, we glean from the record that oral consents and oral appearances of substitute attorneys were made where a written consent was not filed.
 
 
 39
 Some attorneys were absent more often than others, but none of the 11 lawyers who participated in the defense had a perfect record of trial attendance. However, careful examination of the record discloses that not once during the trial was any defendant without adequate representation by a thoroughly competent lawyer. The acquittal of 10 defendants whose regular attorneys were on occasions absent from the court room points up that the procedure now so vociferously condemned did not result in prejudice to the rights of any one of the defendants.
 
 
 40
 Neither does the record bear out the assertion, highlighted in the brief on appeal, that appellant Springer was without representation on the afternoon of May 22. In the absence of Mr. Cohen and Mr. Rosenberg on the morning of May 23, the court recessed the trial until the morning of May 24, when Mr. Cohen was again present. Upon motion of Mr. Cohen made at that time, the court instructed the jury that all testimony of the witness who testified on the afternoon of May 22 was to be disregarded as to Springer. In a subsequent conference in the Judge's chambers on May 25, Springer admitted under oath, contrary to his prior statement to the court, that he had in fact consented to Mr. Rosenberg's absence on the afternoon of May 22 and to representation by Mr. Allen or Mr. Lindell.
 
 
 41
 While the procedure followed in this case is not to be encouraged and should be avoided, we are nevertheless fully convinced that the constitutional safeguards were jealously preserved for the benefit of all defendants; that the trial judge fully discharged '(his) duty of seeing that the trial * * * (was) conducted with solicitude for the essential rights of the accused,' Glasser v. United States, supra, 315 U.S. at 71, 62 S.Ct. at 465, and that '(appellants') claim of prejudice is plainly 'an afterthough." United States v. Simone, 2 Cir., 205 F.2d 480, 483 (1953).
 
 VI
 
 42
 As the third phase of the attack on the representation afforded defendants at the trial, appellants Rye, Cova, Butler, Gilbert, and Springer assert that the court, upon holding a conference at which these appellants were allegedly unrepresented, erroneously answered four written questions from the jury delivered to the court during the course of the jury's deliberation.[13] The record reveals that 4 defense attorneys were in fact present at the conference in chambers at which time the post-submission questions of the jury were discussed. All other attorneys, except Allen and Mills, were represented by one of these 4. Our survey of the record convinces us that Butler, Gilbert, and Springer were adequately represented by Mr. Rosenberg during the conference.
 
 
 43
 With respect to the representation of Rye and Cova, it is interestion to note that on the day before the now disputed conference, they, with the approval of both Allen and Mills, consented to be 'represented, in the absence of our attorney, Sam Houston Allen, by Wm. Mills, Esq. in any and all proceedings to and including hearing on probation and sentence, if such there should be.' However, on the day of the conference, Mr. Mills, contrary to the court's request for all attorneys to leave their telephone numbers where they could be reached 'within thirty minutes' or 'not over forty-five minutes,' was not present, did not leave a telephone number, and was unable to be found after a concerted effort was made. The record provides Mr. Allen, an employed attorney, with scant basis to complain of his own absence, and of the absence of his designated associate. Apropos is the statement of the court in Newagon v. Swope, 9 Cir., 183 F.2d 340 (1950), cert. denied 340 U.S. 921, 71 S.Ct. 352, 95 L.Ed. 665 (1951):
 
 
 44
 'We think that to say that the courts must cease to function, indeed, are without jurisdiction to proceed further, until they search for, seek out and bring in counsel whose duty it is to be in court, and who by their own volition are absent, is to indulge in over-meticulous nicety of construction of the constitutional provision.' 183 F.2d at 341.
 
 
 45
 However, the ultimate answer to this assertion is that no prejudice resulted from the court's response to the jury's inquiries. While condemning the 'stand-in representation' in one breath, in the next counsel for Butler, et al. contends that appellants who were allegedly unrepresented at the conference have the right to adopt the objections made by the attorneys who were present, and thus avail themselves of any assignment of error that the represented appellants may have. If we were to allow this contention, certainly the supposedly unrepresented appellants would have no valid claim that they were afforded less protection than those appellants whose attorneys were actually present. But we need not rest our conclusion upon representation by adoption, for our careful examination of the court's response to the jury's written questions convinces us that neither the objections that were actually lodged, nor any others that might have been made by Allen, Mills, Sperry, or Cohen, were or could have been grounded upon any legitimate foundation. Since the court's answers were legally sound, the fact that a few attorneys voluntarily absented themselves from the post-submission conference can in no concelvable manner be found to have resulted in prejudice to any appellant.
 
 VII
 
 46
 The sexth point briefed by Butler, et al. is focused upon a remark made by the court to the veniremen in the preliminary stage of the trial. In addressing the jury panel, the court stated that defendants Sinclair, Wiebe, Carson and Rocker 'have not been arrested.' Thereupon Mr. Allen requested the court to 'admonish this panel that they are not to draw inferences or any presumptions that there's nothing in Your Honor's remarks to suggest there's been any flight on the part of any co-defendants and that no attainments of any kind are to be drawn from the remark.' The court immediately granted the request, stating, 'The entire jury panel has heard the remarks of Mr. Allen. Those remarks are correct and you are so instructed.'
 
 
 47
 This entire contention is completely without merit. The remarks were neither erroneous nor prejudicial-- they did not attribute any wrongdoing to any defendant on trial-- and in our opinion they were properly made. Furthermore, the request for an admonition to the panel was promptly granted. We also find that it was not improper or erroneous for the court to admit evidence relating to transactions in which the defendants who were not arrested played a part.
 
 
 48
 Sunderland v. United States, 8 Cir., 19 F.2d 202 (1927), cited by appellants, is clearly distinguishable. More apposite in principle is Wood v. United States, 8 Cir., 279 F.2d 359 (1960).
 
 VIII
 
 49
 Benedec, et al. also contend that the jury impeached its own verdicts in a note delivered to the court on the day the verdicts were entered but prior to their announcement in open court. The note read:
 
 
 50
 'The jury arrived at its verdict by applying counts charged and established by the government against all defendants found guilty on the basis of time spent with the company.
 
 
 51
 'The difference in counts applied does not infer any decision by the jury as to degree of guilt for any defendant. Jury Foreman, Carl W. Schauss.'
 
 
 52
 The general rule is that jurors may not impeach their verdict, Stein v. New York, 346 U.S. 156, 178, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); Lohr v. Tittle, 10 Cir., 275 F.2d 662, 667 (1960); Manhattan Oil Co. v. Mosby, 8 Cir., 72 F.2d 840, 847 (1934), cert. denied, 293 U.S. 623, 55 S.Ct. 237, 79 L.Ed. 710 (1934), but the rule is not so inflexible as to invariably preclude inquiry into what transpired during the jury's deliberation, or to prevent reversal due to the exertion of extraneous, prejudicial influences upon the jury. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892). See also United States v. Grieco, 2 Cir., 261 F.2d 414 (1958), cert. denied, 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959); Jorgensen v. York Ice & Machinery Corporation, 2 Cir., 160 F.2d 432 (1947), cert. denied, 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 349 (1947). However, the cases indicate that a juror's testimony revealing the reasons that in fact induced him or other members of the jury to arrive at their verdict cannot be admitted as impeachment testimony. United States v. Crosby, 2 Cir., 294 F.2d 928, 949-950 (1961), cert. denied, Mittelman v. United States, 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962); Rotondo v. Isthmian Steamship Co., 2 Cir., 243 F.2d 581 (1957), cert. denied, 355 U.S. 834, 78 S.Ct. 53, 2 L.Ed.2d 45 (1957).
 
 
 53
 While the cited cases deal with impeachment subsequent to the entry of a verdict, Benedec, et al., without citing any authority, assert that here a reversal is required for the jury announced to the court, prior to entry of their verdicts, a method, unauthorized by law, by which they proposed to reach them. Perhaps the court should not have accepted the voluntary, explanatory communication from the jury foreman. Nevertheless, we like the trial judge, fail to see how the foreman's note can be interpreted so as to impeach the jury verdicts. It is apparent to us that the disputed portion of the note merely indicated that the jurors found a defendant guilty only as to those counts alleging a date prior to such defendant's termination of employment with Lenders-- a procedure clearly authorized under the court's instruction. Even assuming that a jury can impeach their verdict prior to its entry through declaration of an erroneous method of determination, in this case it is overwhelmingly evident that they did not do so, and that their explanatory note, though serving no useful function, was consistent with the verdicts returned and actually demonstrated the jury's adherence to the court's instructions.
 
 IX
 
 54
 The final point advanced by Butler, et al. consists of the abstract statement, 'The Trial Was Unfair.' It would serve no illuminating purpose to recount the thirteen sub-assignments of error asserted thereunder or to dispose of them individually. All have been carefully reviewed and considered, and neither severally or collectively, do thet constitute prejudicial error requiring a reversal for another trial. A number of the assignments are plainly frivolous,[14] others are a rehash of the six preceding assignments briefed by Butler, et al. which we have heretofore individually considered. Most of the thirteen sub-assignments are centered in and focused upon the theme which is found threading its way throughout the brief of Butler, et al. and which appears as a separate assignment of error in the brief of Benedec, et al.: to wit, that appellants were deprived of due process by virtue of the fact that they were tried in a 'mass trial.'[15]
 
 
 55
 The problems inherent in the trial of the so-called 'big case' involving numerous parties and multiple issues is neither new or novel. Approximately a decade ago and as a result of organized efforts by the bench and bar, protracted cases became the subject of concern and committee study. Thereafter another committee, appointed by the Chief Justice of the United States, conducted an intensive study of the problems and difficulties attending protracted trials. See Seminar on Protracted Cases, 21 F.R.D. 395 (1957). There emerged from this project the 'Handbook, Protracted Cases-- Recommended Procedures,' see 25 F.R.D. 351 (adopted by Judicial Conference of United States, March, 1960). To be sure, the Handbook is not a panacea-- adherence to the procedures recommended therein will not necessarily obviate error in the trial-- but the study and its product do demonstrate that the judiciary and the members of the bar alike recognize that the complexity and bigness of many of the controversies arising in this modern era will bring to the courts the protracted and complicated case.
 
 
 56
 Appellants' sweeping attack on 'mass trials' in general and their contention that in the instant case an unfair trial was the only one obtainable because the numerous defendants were tried together is without authoritative support. Protracted criminal trials involving multiple defendants or complicated issues or both, have occurred in the past. E.g., Isaacs v. United States, 8 Cir., 301 F.2d 706 (1962), cert. denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962); United States v. Stromberg, 2 Cir., 268 F.2d 256 (1959), cert. denied, 361 U.S. 863, 80 S.Ct. 119, 123, 124, 130, 4 L.Ed.2d 102 (1959) (19 defendants); United States v. Dennis, 2 Cir., 183 F.2d 201 (1950), affirmed, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); Capriola v. United States, supra, 61 F.2d 5 (59 defendants); Allen v. United States, 7 Cir., 4 F.2d 688 (1924), cert. denied, Hunter v. United States, 267 U.S. 597, 45 S.Ct. 352, 69 L.Ed. 806 (1925) (63 defendants). Of course, protracted trials must be considered on a case-by-case basis, and the mere fact that in the past multiple defendants have been convicted in complicated trials that were conducted fairly and without error, obviously furnishes no controlling precedent for affirming the convictions in this case. But certainly such trials can be and have been fairly conducted, and we are firmly convinced that this case is one that is free of prejudicial error.
 
 
 57
 Rule 8, Fed.R.Crim.P., specifically provides that two or more defendants may be charged in the same indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Thus, with no legal limitation upon the number of defendants who may be jointly indicted, teh question whether a defendant is prejudiced by a joinder of offenses or of defendants in an indictment is in the first instance addressed to the sound discretion of the trial court who may, in the exercise of such discretion, order separate trials or grant a severance of defendants. Rule 14, Fed.R.Crim.P. The trial court's refusal to order separate trials or grant severance is not grounds for reversal unless the record indicates an abuse of discretion. Opper v. United States, 348 U.S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); Guon v. United States, 8 Cir., 285 F.2d 140, 142 (1960); Goodman v. United States, supra, 273 F.2d 853, 860; Kansas City Star Company v. United States, 8 Cir., 240 F.2d 643, 651-652 (1957), cert. denied, 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957). Here, the record reveals that the trial court carefully considered the motions for severances, and we are satisfied that an abuse of discretion did not result, and that no injustice arose from the joint trial.
 
 
 58
 As is usually the situation in a protracted trial, difficult questions were presented, but they were not insurmountable. Judge Register was conversant with the issues; he demonstrated a keen awareness of the controlling legal principles; he was quick to grasp the purport of the numerous objections that were made and when necessary afforded counsel full opportunity to be heard. His rulings were fair and safeguarded the rights of all defendants. He presided with understanding and patience even though it appears that on occasions counsel were attempting to provoke error. The instructions were comprehensive, but they clearly and understandably delineated the issues to be resolved by the jury and correctly declared the controlling law. Indeed, counsel for Butler, et al., although taking exceptions to certain instructions, expressed general approval of them, observing: 'As I stated to Your Honor before, I think by and large that these are very fair and impartial instructions and substantially state the law.'
 
 
 59
 Neither are we convinced that the jury was hopelessly bewildered, that it could not properly evaluate and apply the evidence against the individual defendants, and that 'it was shameless fiction to assume that any jury could have resolved the issues in this case by the means provided by law.' We note that the verdicts were reached after more than 8 days of deliberation. The exhibits, which in and of themselves afforded pertinent proof of the fraudulent activities of the defendants who were convicted, were in the hands of the jury. The results indicate that the jury carefully and meticulously sifted, examined, and considered the evidence and with discernment reached verdicts which are not now assailable. We firmly believe that, under our system of jurisprudence, this jury of reasonably prudent individuals, under proper guidance of an able, experienced and dedicated judge, was able to and did comprehend and appraise the evidence against each defendant, and that by its verdicts meted out justice under the law.
 
 
 60
 In summary, we note that, as previously demonstrated, the record is remarkably free of any error that could have been conceivably prejudicial to any of the appellants. Their constitutional rights were safeguarded and preserved and, accordingly, the judgments of conviction are
 
 
 61
 Affirmed.
 
 
 
 [1]
 Section 1341 of Title 18 U.S.C.A. provides:
 'Whoever, having devised * * * any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises * * * for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department * * * shall be fined not more than $1,000 or imprisoned not more than five years, or both.'
 
 
 [2]
 Named as defendant in the indictment in Sampson is Lenders Service Corporation, the predecessor to Lenders Service Company, Inc., the corporate defendant herein
 
 
 [3]
 During the trial, on motion of the United States Attorney, Counts 6 and 9 of the indictment were dismissed as to all defendants. Additionally, upon motion of the United States Attorney and without objection, the court dismissed each count as to such defendants that had terminated their employment with Lenders prior to the date of the alleged fraudulent use of the mail forming the basis for such dismissed count
 
 
 [4]
 The appeal has been considered on the original records, consisting of 7 volumes of original pleadings, papers, motions, etc.; 58 volumes of transcript, which include the opening statements, numerous motions, arguments, and testimony in question-and-answer form, totaling 14,373 pages. The Government offered 109 witnesses in presenting its case in chief, and 4 rebuttal witnesses. There were 27 defense witnesses offered. Additionally, a multitude of exhibits, some consisting of numerous documents, were offered and received in evidence. Only 3 of the appellants, Rye, Cova and Hain, testified in their own behalf
 
 
 [5]
 The postition of appellants with Lenders Service was: Springer, president, from June 1, 1959, to on or about March 4, 1960; Hain, vice-president; Butler, national sales director, also was a regional director; H. Eugene Gilbert, assistant to Butler, trained field representatives, also acted as regional director and as field representative; Herndon, trained field representatives, also was regional director and field representative; Cova, general manager; Rye, systems and procedures analyst, also trained personnel; Mitchell and Brandon, regional directors; Stadin and Eakins, regional directors and field representatives; Benedec, Ringger, Ostrowsky, Schwarz, Wangberg and Taggart, field representatives
 
 
 [6]
 The advance fee varied according to the amount of the loan desired, e.g., according to the 'sales kit,' the standard advance fee for a $5,000 loan was $200, with an additional $200 due to Lenders after obtaining the loan. The standard advance fee for a $100,000 loan was $1,000, with an additional $1,000 due on completion. However, the suggested fee schedule was not always strictly followed
 
 
 [7]
 It is not without significance that during sentencing procedure, counsel for these appellants made pleas to the court designed to mitigate their fraudulent participation in the scheme. There was no suggestion by counsel or appellants of mistaken identity. Two of these appellants, Benedec and Wangberg, in personally seeking probation, made statements of their activities with Lenders
 
 
 [8]
 This assignment of error does not appear specifically in the brief filed on behalf of appellants Benedec, et al., but the latter adopted, by reference, all assignments in the brief of appellants Butler, et al
 
 
 [9]
 The essence of this rule is that the names of the defrauded individuals need not be set forth in the indictment where the scheme is of such a nature that a particular class, such as 'persons engaged in the mercantile business, who were and are residents of the different states of the United States,' or the 'public generally' are the intended victims and are so designated in the indictment
 
 
 [10]
 The Government actually used only two court days for its closing argument compared to three days consumed by the defense attorneys
 
 
 [11]
 Representation by court-appointed attorneys:
 Representation by employed counsel:
 
 
 [12]
 Appellant Springer filed numerous consents, the first on March 14, 1961, wherein he consented 'to the departure of my attorney, Edward M. Cohen from the Court Room during the trial at the following times: 3:30 every Friday afternoon; March 23 and 24, 1961, all day; April 28, 1961, all day. I do hereby consent also to the appointment of Max D. Rosenberg * * * of Bismarck, North Dakota, as my attorney during the intervals that Mr. Edward M. Cohen is absent from the Court Room.' (Signed)
 Appellants Brandon, Mitchell, Ringger, Taggart, Eakins and Wangberg agreed and consented 'that our attorney Francis Breidenbach * * * is hereby authorized * * * to absent himself from the trial of this action upon making suitable arrangements for our representation by another attorney during his absence, and we each do further agree that his absence * * * shall not be used by us as a reason for a delay or an assertion of error.'
 
 
 [13]
 The case was submitted to the jury on July 31, 1961, the disputed questions from the jury were delivered to the court on August 8, 1961, and the verdicts were returned on August 9, 1961
 
 
 [14]
 Falling in this category is the complaint that the court erred because it dismissed certain counts of the indictment as to some defendants upon motion of the United States Attorney rather than on motion of defendants; and the contention that it was unfair to try 'these appellants for the alleged crimes of a dead man.'
 
 
 [15]
 The term 'mass trial' was employed by various defense counsel below, and again appears in the briefs on appeal in addition to numerous other references to the size of the case