**UNITED STATES of America, Plaintiff,**

v.

**David FENSTER, Defendant.**

**Crim. No. 7–81238.**

United States District Court,
E. D. Michigan, S. D.

April 18, 1978.

Peter J. Kelley, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Warren J. Perlove, Southfield, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, District Judge.

The defendant herein was charged with violations of the bribery statute, 18 U.S.C. § 201, in a four-count Indictment returned and filed on November 15, 1977. Specifically, defendant is alleged to have paid $200.00 on four separate occasions (viz., November 24, December 3, December 10, and December 17, 1976) to a U. S. Veterinarian-Inspector for the purpose of influencing that official in decisions and actions regarding inspections of meat at a meat-processing plant. On Wednesday, March 1, 1978, defendant waived his right to trial by jury. The government acquiesced in the waiver and the Court, having conducted an inquiry on the record, was satisfied that the waiver was voluntary and intelligent. Trial was begun on that day and concluded on the next. What follows is a narrative exposition of the Court's findings of fact and conclusions of law.

Prior to March, 1975, health and sanitation inspections at the Utica Packing Plant had been conducted by State officers who were, by virtue of statutory and contractual authority, supervised by federal officers and who enforced pertinent federal regulations. After March, 1975, the responsibility for inspections and enforcement devolved directly on federal authorities, and a staff of federal inspectors assumed the relevant duties. At all times pertinent here, the staff consisted of Craig A. Reed, a Doctor of Veterinary Medicine, and five or six lay inspectors, Dr. Reed having supervisory authority over the lay inspectors assigned to the plant. Dr. Reed was himself responsible to a circuit supervisor and thence to a regional supervisor. The staff worked on the plant premises and every animal was inspected at various stages by the inspectors.

Utica Packing was engaged in the slaughter and processing of hogs. The production process—killing, cleaning, eviscerating, sectioning, storing, and shipping—was controlled to a large extent by the federal

inspectors, who could slow the process by requiring the correction of particular problems in individual units found to be unsatisfactory or who could stop the entire process until correction of a more pervasive unsatisfactory condition was made. For example, an inspector might tag a carcass for having hair on the skin. In that instance, the carcass would be laid aside until the condition was remedied and thereafter returned to the production line. On the other hand, if the inspector discerned a repetition of certain unsatisfactory conditions that might, for example, be attributed to a defect in the cleaning equipment, the entire line would be shut down until the defect was found and remedied. It is appropriate at this point to note that a particularly important part of the inspection process is the examination of hogs for evidence of tuberculosis because of the particular susceptibility of that animal to that disease. Depending on the type of tuberculosis involved, and on the location and extent of the involvement, a carcass may require sectioning with loss of some parts, or it may be rejected altogether or approved altogether. It is readily apparent that the shut-down of the lines, in a plant that employed approximately 100 persons, and the rejection of carcasses as diseased affect directly the efficiency and profitability of the operation.

As is perhaps inevitable in that type of situation, some friction developed between management and the inspection team. The former complained that some shutdowns were unnecessary or had been unnecessarily prolonged; that inspectors were too strict or picayune; that the inspectors were acting arbitrarily and capriciously. On the other hand, the veterinarian assigned to the plant considered that his conduct and performance were proper, that the plant needed upgrading and that the staff, in the main, was following the regulations and enforcing them fairly.

In September, 1976, an inspection of the plant was conducted by the regional office of the U. S. Department of Agriculture and resulted in a rating of 1 on a scale of 1 through 4, 4 being the best and 1 the worst rating assignable. This result was brought to the attention of David Fenster, a part-owner of the plant, by Dr. Reed on September 21, 1976. At that meeting, Fenster suggested to Reed that an arrangement be made between them which would be worth $100 to $200 a week to Reed and which would result, in return, that there be fewer stoppages of the line and a lower condemnation rate. Thereafter, Reed attempted to contact an FBI agent whom he knew as a result of a prior, unrelated investigation, but did not succeed in reaching him until November, 1976. The two of them devised a plan whereby Reed would appear to accept the offer made by Fenster. Reed was provided with a concealed body transmitter and recorder and, so equipped, met with Fenster on the four dates delineated in the Indictment. On each such occasion Reed received the sum of $200 from Fenster. The conversations between Reed and Fenster were recorded and subsequently transcribed; the transcripts were received in evidence as Exhibits 1B, 2B, 3B, and 4B.

There is no doubt that David Fenster paid over the funds to the federal officer and that it was his intent to influence the officer in the performance of his official duties. The issue remains, however, as to the nature of Fenster's intentions, since that issue will determine whether he is guilty of a violation contemplated in 18 U.S.C. § 201(b) or of one described in § 201(f), the former carrying a much higher potential penalty than the latter.

Section 201(b) of Title 18 of the United States Code provides for the imposition of penalties on

"[w]hoever, directly or indirectly, corruptly gives, offers, or promises anything of value to any public official * * * with intent—

"(1) to influence any official act; or

"(2) to influence such public official * * * to commit or aid in committing, or collude in or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

"(3) to induce such public official * * to do or omit to do any act in violation of his lawful duty, . . ."

Subsection (f), on the other hand, is directed against

"[w]hoever, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly gives, offers, or promises anything of value to any public official, * * * for or because of any official act performed or to be performed by such public official * * ; . . ."[1]

Subsection (f) sets forth a lesser offense included in the offense described in subsection (b), the difference consisting in the higher degree of criminal knowledge and purpose betokened by the adverb "corruptly." *See U. S. v. Umans,* 368 F.2d 725 (2d Cir. 1966), *cert. dismissed* 389 U.S. 80, 88 S.Ct. 253, 19 L.Ed.2d 255; *U. S. v. Brewster,* 165 U.S.App.D.C. 1, 506 F.2d 62 (1974) [construing the analogous provisions of § 201(c) and (g) applicable to *recipients* of bribes].

In *Brewster,* the court was squarely faced with the problem of dividing the subtle gradations of the respective intent requirements prescribed in subsection (c), which it termed the bribery section, and subsection (g), which it called the gratuity section. It concluded, as to this question:

"The bribery section makes necessary an explicit *quid pro quo* which need not exist if only an illegal gratuity is involved; the briber is the mover or producer of the official act, but the official act for which the gratuity is given might have been done without the gratuity, although the gratuity was produced because of the official act."

*Id.* 165 U.S.App.D.C. at 11, at 72.

The thrust of the two sections and the functions they were designed to serve are radically different, and it is from the perspective of that difference that they are to be construed and applied. Section 201(f) is a gratuity section.

"It is apparent from the language of the subsection that what Congress had in mind was to prohibit an individual, dealing with a Government employee in the course of his official duties, from giving the employee additional compensation or a tip or gratuity for or because of an official act already done or about to be done."

*U. S. v. Irwin,* 354 F.2d 192 at 196 (2d Cir. 1965), *cert. denied* 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308.

Section 201(b), on the other hand, is directed against impairment of the actual and apparent integrity of public life.

"The evil sought to be prevented by the deterrent effect of 18 U.S.C. § 201(b) is the aftermath suffered by the public when an official is corrupted and thereby perfidiously fails to perform his public service and duty. Thus the purpose of the statute is to discourage one from seeking an advantage by attempting to influence a public official to depart from conduct deemed essential to the public interest."

*U. S. v. Jacobs,* 431 F.2d 754 at 759 (2d Cir. 1970), *cert. denied* 402 U.S. 950, 91 S.Ct. 1613, 29 L.Ed.2d 120.

In light of these standards, the Court is satisfied that the facts established at trial bespeak beyond a reasonable doubt a violation of § 201(b). It is clear that in offering the payments and later in making them David Fenster had a more focused purpose in mind than merely to build a reserve of good will toward his company on the part of influential officials. It was Dr. Reed's understanding that in return for the money he was to alleviate Fenster's problems, specifically by reducing the number of

---

1. Section 201(a) defines "public official" to include "an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, * * * in any official function, under or by authority of any such department, agency, or branch of Government * * *."

"Official act" is defined in the same subsection to include "any decision or action on any question * * * which may by law be brought before any public official, in his official capacity, or in his place of trust or profit."

line stoppages and by giving the company the benefit of the doubt with regard to hogs of questionable soundness. This understanding is borne out by the transcripts of the recorded conversations between Reed and Fenster. They reveal that while Fenster expected Reed to maintain an appearance of conscientious enforcement (Exhibit 1B, pp. 11 and 14), he also expected that more hogs would be passed (Exhibit 1B, pp. 9, 13–14; 2B, pp. 21 and 23; 3B, p. 29), that the production line would be shut down less frequently (Exhibit 1B, pp. 14, 15–18 [falsify time sheets so that inspectors would have less inducement to stop the line for the purpose of earning overtime pay]; 2B, p. 21; 3B, pp. 30–31), and that Reed would attempt to control an overzealous inspector (Exhibit 3B, pp. 29–31, 35).[2] In short, the evidence of a quid-pro-quo arrangement sufficient to establish a violation of § 201(b) is, in the opinion of this Court, overwhelming.

█ There remains, however, one fundamental issue, which the defendant brought to the Court's and the government's attention at his closing argument, viz., whether the government's proofs adequately establish the identity of defendant with the David Fenster to whom the evidence relates. Counsel properly and correctly points out that no witness ever pointed out defendant, sitting in open court, as the one to whom he was referring. The lack of an explicit, in-court identification of the defendant was one of the two bases on which counsel constructed his closing argument. While counsel for the government was thus put on notice of the defendant's concern in this regard, he declined to seize the opportunity to cure whatever irregularity might be so found in its proofs by moving to reopen its case for that limited purpose, instead choosing, surprisingly, to waive all rebuttal whatsoever.

The Court is thus left to make a determination which it finds, quite frankly, troubling. That it is a rarely encountered problem is suggested by the dearth of reported cases dealing with it. The seriousness of the problem and its peculiar nature led the Court to take the unusual step of seeking the further guidance of the parties by directing the attorneys to furnish briefs addressed to the question.[3]

First of all, it should be observed that there is no question but that the man who stood trial was indeed named David Fenster. At the time immediately before trial when the Court inquired into the voluntariness of the waiver of jury trial, the defendant responded affirmatively and unequivocally when the Court asked whether he was David Fenster. At no time during trial or now in their brief do his attorneys deny that the person whom they represent and who sat with them at the defense table was David Fenster. Without more, however, mere similarity of names is not ordinarily sufficient to settle the question of identity, once raised.

It is axiomatic that an element to be proved in every case is that the person who stands before the court in the position of defendant is the one whom the indictment or information accuses and to whom the evidence is supposed to relate. In many cases, however, this element is not litigated and so remains as only an implicit issue. In other instances identification is a very real and hotly contested issue, as, for example, where the opportunity of the witnesses to observe the perpetrator at the time of the commission of the crime or their ability to recall accurately at trial are the subject of substantial exploration. This case is clearly of the former type and not of the latter; it is not a case of possible misidentification, of suggestive pretrial procedures, or of uncer-

---

**2.** It is of no particular significance or consequence that not all the terms of the understanding were set out on every occasion that Fenster made payments to Reed. While the Court, as trier of fact, must consider each count separately, what was said on one occasion has a proper bearing on the question of the briber's intent on another occasion. *See Krogmann v. U. S.*, 225 F.2d 220 at 228 (6th Cir. 1955).

**3.** In connection with these briefs, a transcript of the trial testimony was prepared. References are made to the transcript, *infra*.

tain, equivocal, or indecisive in-court identifications. Rather, defendant has interposed a highly technical objection to the technical sufficiency of the government's proofs. It is not, however, an objection that in the end withstands analysis, for the reasonable inferences to be drawn from the evidence properly before the Court support beyond a reasonable doubt the conclusion that the David Fenster who appeared in the courtroom during the trial was the David Fenster whose words were transcribed in the exhibits and whose behavior was reported by the witnesses.

The issue having been thus narrowed, the only apposite cases that have come to the Court's attention are *U. S. v. Metz,* 312 F.2d 199 (6th Cir. 1963) and *Butler v. U. S.,* 317 F.2d 249 (8th Cir. 1963). The first is distinguishable and the second is grounded on a rationale arguably so inconsistent with our accusatorial form of criminal justice that this Court cannot adopt it.

*Metz* involved the prosecution of two co-defendants, one for transporting a young woman in interstate commerce for immoral purposes, and both for conspiring to commit that offense. Both defendants were joined in a single trial. The evidence against the defendant accused only of conspiracy, one Kenneth Eugene Miller, consisted of the testimony of the young woman and of the co-defendant. Throughout their testimony they referred to the appellant as Blackie or as Blackie Miller; in addition, the prosecuting attorney referred to him in the same manner in the trial. The Sixth Circuit ruled:

> "Nowhere in the record do we find any connection between Blackie or Blackie Miller and the Kenneth Eugene Miller, who stood trial in this case. For this reason, the judgment of conviction of the appellant, Kenneth Eugene Miller, is reversed and his case remanded to the District Court for further proceeding in con-

formity with this opinion." 312 F.2d at 200.

Several considerations come to mind which serve to distinguish *Metz* from the instant case. First of all, the case involved two defendants, one of whom was clearly and properly found guilty.[4] Moreover, the co-defendant, in addition to the conspiracy of which Miller was also convicted, was found guilty of a highly inflammatory and possibly prejudicial or sensationalized substantive offense; it appears, consequently, that the circumstances of the prosecution were especially fraught with the danger of finding guilt by association. Furthermore, the jury did not have grounds of inferring the identity of the person present at trial and the person about whom testimony was adduced from even an identity of names, where no evidence was presented that the defendant Kenneth Eugene Miller was known by the nickname Blackie. Finally, the Court takes note of the enigmatic quality of the terms of the appellate court's mandate; we do not know what further proceedings were had in conformity with the court's opinion, or what further proceedings the court may have considered appropriate. It is not clear to this Court that if reversal of the conviction was to spell acquittal of the defendant under the Double Jeopardy Clause, the Sixth Circuit should not have simply ordered entry of judgment of acquittal then and there.

In sum, then, *Metz* stands for the proposition that some connection must be established in the evidence between the person named therein and the person standing trial. It does not prescribe what that connection must be in every case, or how it must be established.

The lengths to which some appellate courts will go in preserving intuitively just verdicts against technical attack are illustrated by the *Butler* case, *supra.*[5] The

---

4. The conviction of Metz, Miller's co-defendant, was affirmed.

5. The Court notes that defendant, without acknowledging his source, or even the fact of the quotation, sets out at page 4 of his brief the

exact language and the very sources used by the *Butler* court:

> "The authorities dealing with the general subject of identification of the accused, and particularly with the quantum and quality of proof required to establish this element of a

question first considered by the court bears a close similarity to the issue now under discussion: "[I]t is claimed that, notwithstanding the existence of evidence which established that persons bearing the names of these appellants were associated with Lenders, no witness connected such names with the corporeal defendants on trial." The Eighth Circuit, having taken note of the length and complexity of the trial and the nature of the charge—the case involved a 33-count indictment charging mail fraud against a corporation and 36 individuals and took about four months to try—, and being obviously impressed that the question was raised for the first time only on appeal, ruled that under the circumstances of that case the appellants could be taken to have admitted their identity with the persons named in the Indictment and at trial:

> "It is inconceivable that these appellants, individually or collectively, would have sat mute and subjected themselves to the ordeals of the lengthy trial if they sincerely and in good faith believed they were being tried for an offense with which they were completely disassociated." 317 F.2d at 254.

It may be significant that it appears that this portion of the court's opinion has never been cited again, not even in its own Circuit. Certainly, the suggestion is all but overpowering that such a rationale is inconsistent with the Fifth Amendment privilege against self-incrimination, especially in light of the precept of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), decided two years after *Butler*, that a defendant's failure to take the stand in his own behalf cannot be made the subject of comment by either the court or the prosecution. Therefore, this Court declines to follow *Butler* by holding that Fenster's failure to object to the insufficiency of the government's proofs amounted to an admission on the issue of identity.

Nonetheless, however faulty may have been the *Butler* court's *application* of the principle that identity need not be proved by direct, in-court identification but may properly be inferred from the totality of the evidence and the course of the trial proceedings, the validity and vitality of that principle endure. While the Court may not and does not take into account the fact that defendant did not take the stand and that at no point up to closing argument did the question of identification appear to be contested, it is satisfied that other circumstances brought out at trial have great bearing on the question.

Six witnesses testified altogether; each one stated that he knew David Fenster (or at least someone denominated as "Mr. Fenster") Dr. Reed worked at the Utica Packing Plant for two years (Tr. at 4) and during that time had almost daily contact with Fenster, who served, along with his partner, as a main supervisor (Tr. at 5). Dr. Landskron, during the period of his tenure, made monthly visits to the plant (Tr. at 101), on which occasions he had personal contact with Fenster (Tr. at 110–111). Two agents of the Federal Bureau of Investigation testified, both of whom knew David Fenster. One knew him from personal contact in the course of an earlier investigation (Tr. at 113); the other had recognized him on an earlier occasion from a physical description (Tr. at 97) and saw Dr. Reed and Fenster together when Fenster passed money over to Reed. In addition, two workers from the plant were called to the stand by the defendant, one of whom was a foreman; they had worked there five years and six years, respectively (Tr. at 116 and 133). Thus, the Court was presented with the testimony of six individuals, all of whom were personally familiar

---

criminal case, uniformly hold that proof of the identity of the person who committed the offense is essential to conviction. 20 Am. Jur., Evidence § 1222 (1939); 22A C.J.S. Criminal Law § 616 (1961); 1 Underhill, Criminal Evidence § 127 (5th Ed.1956); 1 Conrad, Modern Trial Evidence § 57 (1956)." 317 F.2d at 254.

More importantly defendant also fails to relate the significant sentence which immediately follows the passage just quoted:

> "The same authorities make it abundantly clear that identification may be established and inferred from all of the facts and circumstances in evidence." *Id.*

with David Fenster, all of whom offered testimony which related in some way to David Fenster, all of whom presumably knew that David Fenster was on trial, and none of whom protested that the man sitting in the courtroom at the defense table was not the David Fenster (or the Mr. Fenster) to whom he was referring. It is beyond the powers of this Court to conceive that these witnesses, all of whom struck it as sincere, earnest, and conscientious, would sit silently by and countenance the infliction of such a staggering injustice as would be occurring if the wrong man had been brought to trial. Their silence is eloquent and sufficient to support a finding of identity in this case.

Nevertheless, in the interests of absolute certainty, the Court will reserve issuance of final findings and permit the government a reasonable opportunity to move to reopen its case. Accordingly, the government is given seven days from the date of this order to file such a motion.

IT IS SO ORDERED.